## HUNT COUNTY v. RAINS COUNTY.
### (No. 3036.)

Court of Civil Appeals of Texas. Texarkana. April 17, 1925.

On Motion for Rehearing May 9, 1925. Rehearing Denied Jan. 13, 1927.

**I. Counties ⟨key⟩8—Court cannot direct resurvey establishing different county line than one once run, marked, and established (Rev. St. 1911, art. 1385).**

Under Rev. St. 1911, art. 1385, a court has no power to direct another survey to be made ánd thereby establish another county boundary line, different from one established at some former period, when county line has been once run, marked on the ground, and established in accordance with law.

**2. Counties ⟨key⟩13, 18—Running of county lines on ground and partitioning of territory into precincts are necessary steps in organizing new county.**

The running out of the lines of a new county and partitioning of the territory into precincts are necessary steps in the process of organization of such county.

**3. Counties ⟨key⟩15—Commissioners' proceedings in establishing new county's boundaries were binding on all counties affected, unless lines were not sufficiently special and well ascertained (Acts 1870, p. 2; Paschal's Dig. art. 1057).**

Proceedings of commissioners in establishing boundaries of Rains county, as directed by Acts 1870, p. 2, creating it, were binding equally on all counties affected, as well as public generally, though without their consent, unless lines were not placed on ground in position "sufficiently special and well ascertained," as required by Paschal's Dig. art. 1057; commissioners being agents of Legislature, not of new county or any of original counties.

**4. Counties ⟨key⟩13—Evidence held to show that commissioners caused new county boundary lines to be designated, surveyed, and marked pursuant to statute (Acts 1870, p. 2).**

Uncontradicted testimony of competent witnesses, living in locality, personally acquainted with surveyor and commissioners appointed by Acts 1870, p. 2, to establish Rains county boundaries, knowing what they were doing, seeing them in process of surveying, acquainted with markings on ground, and knowing land surveys through which lines passed and owners and occupants of most of them, that commissioners employed competent surveyor, who surveyed, ran out, and marked lines as directed by such act with assistance of commissioners and others, held to show that commissioners caused lines to be designated, surveyed, and marked on ground pursuant to such act.

**5. Counties ⟨key⟩13—That no map or plat was made and recorded held not to invalidate running of new county's boundary lines (Acts 1870, p. 2).**

That no map or plat of lines run and marked by commissioners named in Acts 1870, p. 2, to establish Rains county boundaries, was ever made and returned for record, would not invalidate their acts, since neither such act nor other statutory provisions then in force so required.

**6. Counties ⟨key⟩13—Line between Hunt and Rains counties held placed by surveyor in sufficiently special and well ascertained position (Acts 1870, p. 2, § 1; Paschal's Dig. art. 1057).**

Boundary line between Hunt county and Rains county, created by Acts 1870, p. 2, § 1, held to have been placed on ground by surveyor in position "sufficiently special and well ascertained," as required by Paschal's Dig. art. 1057.

**7. Counties ⟨key⟩15—County line once run, marked, and established in division of county cannot be held indefinite, though incorrect.**

When a county line has once been run, marked on the ground, and established in accordance with law in the division of a county, it cannot be said to be indefinite, though incorrect.

**8. Counties ⟨key⟩13—Commissioners' extension of new county boundary line beyond statutory call must be assumed to have resulted from mere mistake in measurement (Acts 1870, p. 2).**

As commissioners appointed by Acts 1870, p. 2, to establish boundary lines of Rains county created thereby had no discretionary power arbitrarily to extend length of line fixed by act, but were authorized only to designate, survey, and mark line as defined therein in substantial, though not precise, compliance therewith, it must be assumed that extension of line nearly a mile beyond call designated in act was occasioned by mere mistake of measurement on the ground.

**9. Counties ⟨key⟩8—Act adopting established county boundaries held not limited to lines established on ground under statute providing for joint county surveys; "as now" (Rev. St. 1911, art. 1400; Paschal's Dig. art. 1057).**

Rev. St. 1911, art. 1400, enacted in 1895, as article 822, adopting county boundaries "as now recognized and established" and continuing in force acts defining them, applies generally to official location of boundaries, and is not limited to lines established on ground in accordance with Paschal's Dig. art. 1057, providing for joint county surveys; the words "as now" meaning "till now" or "until the present time."

**10. Counties ⟨key⟩13—Extension of new county line beyond statutory call must constitute grossly excessive annexation of territory, reducing county area, below constitutional requirement, to authorize court to limit excess (Acts 1870, p. 2; Rev. St. 1911, art. 1400).**

To authorize court to limit erroneous excess in length of county boundary line beyond call designated in Acts 1870, p. 2, creating Rains county, it must appear, as matter of law, to be grossly excessive annexation of territory in violation of law as reducing area of county below constitutional requirement, in view of Rev. St. 1911, art. 1400, enacted in 1895 as article 822, adopting then recognized and established county boundaries.

**11. Counties ⬡⊸8—Evidence held to show recognition of county boundary line for many years before enactment of statute adopting recognized county boundaries (Acts 1870, p. 2; Rev. St. 1911, art. 1400).**

Evidence that no proceedings to relocate line, established as boundary between Hunt and Rains counties in 1870 by commissioners named in Acts 1870, p. 2, creating latter county, were taken by commissioners' court of either county until just before institution of suit in 1923, that such courts officially acted in reference to such line in establishing precincts and laying out roads, that each county exercised jurisdiction up to line, and that jurors were selected, taxes assessed, deeds registered, and schools located with reference thereto, *held* sufficient to show recognition of line by such courts and officers charged with duties respecting boundaries for many years before and since 1895 when act (Rev. St. 1911, art. 1400) adopting recognized county boundaries was enacted.

**12. Counties ⬡⊸8—Confusion as to which county parts of certain surveys traversed by boundary line are in or whether it runs by certain farms or localities would not affect operation of statute adopting recognized county boundaries (Rev. St. 1911, art. 1400).**

Mere fact that there was some confusion as to whether parts of surveys, through which boundary line between Hunt and Rains counties ran, according to map of latter county in use in general land office since 1873 and abstracts of land titles published by such office, were in Hunt or Rains county, or whether line runs by certain farms or localities, would not affect operation of Rev. St. 1911, art. 1400, enacted in 1895 as article 822, adopting recognized county boundaries as true boundaries.

**13. Counties ⬡⊸2—Statute adopting recognized county boundaries held not unconstitutional as detaching territory from one county and attaching it to another (Rev. St. 1911, art. 1400; Acts 1870, p. 2, § 1; Const. art. 9, § 1, subd. 3).**

Rev. St. 1911, art. 1400, adopting recognized county boundaries, does not violate Const. art. 9, § 1, subd. 3, as applying to Rains county, created by Acts 1870, p. 2, § 1; being merely a validating or curative act not intended to detach territory from one county and attach it to another without submitting proposition to electors.

**14. Counties ⬡⊸8—Statute approving recognized and established county boundaries should be liberally construed and enforced (Rev. St. 1911, art. 1400).**

Rev. St. 1911, art. 1400, adopting recognized and established county boundaries as true boundaries, is a wholesome statute, which should be liberally construed and enforced as intended to quiet all controversies over such boundaries irrespective of accuracy of surveys.

**15. Statutes ⬡⊸268—Object of curative acts is to effectuate intended action, which failed of expected legal consequences solely because of statutory disability or procedural irregularity.**

The object of curative or confirmatory acts is to enable parties to carry into effect that which they have designed and attempted, but which failed of its expected legal consequences only by reason of some statutory disability or irregularity in their action.

**16. Constitutional law ⬡⊸193—Legislature may legalize by curative statute what it could have legalized by previous statute.**

That which is within the Legislature's authority to legalize by a previous statute may be legalized by a subsequent curative statute.

**17. Constitutional law ⬡⊸193—Legislature cannot validate act which Constitution forbids it to authorize in first instance.**

The Legislature cannot validate an act which it is forbidden by Constitution to authorize in the first instance.

**18. Constitutional law ⬡⊸92—County has no vested right in boundaries.**

A county has no vested right in county boundaries.

**19. Constitutional law ⬡⊸92, 186—Counties' political rights and privileges are not within constitutional prohibitions against retroactive laws and laws impairing vested rights.**

Legislature, as representative of state sovereignty, can exercise absolute power, unless restricted by organic law, over counties' political rights and privileges, which, therefore, are not within constitutional prohibitions against retroactive laws and laws impairing vested rights.

**20. Counties ⬡⊸7—Legislature has full power over county boundaries, subject to constitutional limitations.**

The Legislature has full power over the subject of county boundaries, subject only to constitutional limitations on such power.

**21. Counties ⬡⊸8 — Unauthorized survey of county lines may be validated by statute from its origin.**

An unauthorized survey of county lines is a subject-matter of validation by statute, effective from its origin.

**22. Statutes ⬡⊸268—Ordinarily, curative statutes are wholly retroactive.**

Ordinarily, curative statutes are intended to act upon past transactions, and hence are wholly retroactive.

**23. Counties ⬡⊸2, 8—Statute adopting established county boundaries validated them from date of establishment, and applies to extension of Rains county line beyond statutory call and is constitutional (Rev. St. 1911, art. 1400; Acts 1870, p. 2, § 1; Const. art. 9, § 1, subd. 3).**

Rev. St. 1911, art. 1400, enacted in 1895 as article 822, adopting recognized and established county boundaries as true boundaries, validated such boundaries from date they were established and recognized, and hence applies to extension of line between Hunt and Rains counties beyond call designated in Acts 1870, p. 2, § 1, creating latter county, and does not violate Const. art. 9, § 1, subd. 3, especially as fixing of such line on ground was mere irregularity in exercising powers conferred on commissioners named in latter act.

**24. Counties ☞10—County line, located and acquiesced in for many years, should not be changed, unless expressly required by law (Acts 1870, p. 2).**

In sound policy, a county line which has been located and acquiesced in for many years, as in case of that between Hunt and Rains counties, established in 1870 under Acts 1870, p. 2, creating latter county, should not be changed, unless expressly required by law, though incorrect in first instance.

### On Motion for Rehearing.

**25. Counties ☞14—Constitutional prohibition of detachment of territory from county without electors' approval applies to statute adopting established lines only when conferring original authority on commissioners, as where their establishment of boundaries is absolutely invalid (Const. art. 9, § 1, subd. 3; Rev. St. 1911, art. 1400).**

Const. art. 9, § 1, subd. 3, prohibiting Legislature from detaching any part of existing county and attaching it to another county until approved by majority of electors of both counties, applies to statute, such as Rev. St. 1911, art. 1400, adopting recognized and established county boundary lines as true boundaries, only where such statute would be of same import as if conferring original authority on commissioners at time of its passage, as where their establishment of boundaries is absolutely invalid, not merely irregular or imperfect.

Hodges, J., dissenting.

Appeal from District Court, Rockwall County; Joel R. Bond, Judge.

Suit by Hunt County against Rains County. From a judgment establishing the boundary line between such counties, plaintiff appeals. Affirmed, and case certified to the Supreme Court on motion for rehearing.

Hunt county instituted this suit against Rains county to have the true boundary line between the two counties declared, located, marked, and established. The line in controversy is the west boundary of Rains and the east boundary of Hunt county. Hunt county claimed by its petition that:

"For many years there has been a dispute between the plaintiff and defendant as to true location of the boundary line between said counties, the disputed line being mainly the west boundary line of Rains county and that portion of the east boundary line of Hunt county adjoining the same; * * * that the defendant claims that the N. W. corner of said Rains county is located about one mile farther west and several hundred feet farther north than the real N. W. corner of said county, and that the line runs thence from said point to Hooker's Mill; that the true boundary line between said counties claimed by plaintiff is as follows: Beginning at the southwest corner of Hopkins county as established by Hiram McMillan on March 4, 1861, a stake from which a P. O. marked S. W. brs. N. 88 E. 395.5 vrs., thence W. at 8 degrees and 55 minutes variation 4 miles to a stake from which a bois-d'arc

brs. N. 48 W. 474 vrs., this point being 638 vrs. South abt. 1173 vrs. East of the N. W. corner of the Marshall Crawford survey. Thence S. 25 vrs. W. at 6 miles to a stake on the E. bank of Cow Leach fork of Sabine river about 30 feet from center of creek, from which an elm brs. N. 08 W. 10.8 vrs., an ash brs. N. 86 E. .07.7, both marked X, this point being about 60 vrs. W. of the dam on slough of the old Hooker Mill and about 100 vrs. W. of the site of the old mill * * *; that the line is an old line that has been marked and has existed for many years and is substantially the true and correct line as laid out according to the act creating Rains county, and that no other line has ever been established between said counties, and that no one line has ever been recognized by the county of Hunt, the county of Rains, or by the general land office of this state."

The prayer was:

That "the lines herein described be declared to be the true boundary line, and, in any event, that the true boundary line be ascertained, located, marked and established."

The county of Rains by its answer claims: That "the act creating Rains county appointed commissioners (naming them) with full power to organize the county and to employ a competent surveyor to run the county lines, and that the commissioners proceeded with the organization of the county and employed Perry Taylor, a competent surveyor, and that said Perry Taylor, with the assistance of the commissioners and others, surveyed and ran out the lines of Rains county as provided and directed by the act, and actually marked and established the lines upon the grounds. * * * That the field notes of Rains county as so laid out and established were returned to the general land office on October, 21, 1872, by J. W. Montgomery, who, at the time, was the duly elected and qualified surveyor of Rains county, and are as follows (here follows description). That the line so established has since that time been recognized. That the lines so laid out and established in 1870, and as described in the field notes returned to the general land office in 1872, is the true boundary line between said counties. That there has not ever been any controversy as to the location of the boundary lines or any portion of said lines between Hunt and Rains county. That the land contiguous to said line," etc., has been recognized as the boundary line. The prayer was:

That "plaintiff take nothing by reason of its suit; that the court enter its decree declaring the boundary line established in 1870 to be the true boundary line between said two counties."

Rains county was created by the Act of 1870, p. 2. Section 1 of the act reads:

"That a new county, to be called Rains county, is hereby established out of the following portions of Wood, Hunt, Hopkins and Van Zandt

---

counties, bounded as follows, viz.: Beginning on the north bank of Sabine river, at Collins ferry, known as Mud bridge, thence in a northern direction through a tract of land known as the Jim Bridge's tract, to the McMillan boundary line between Wood and Hopkins counties, thence west with said line four miles into Hunt county, thence about southwest in a direct line to Hooker's Mill on the east branch of Sabine river, thence down Sabine river with its meanderings to the place of beginning."

At the same session of the Legislature the boundaries of Hopkins and Hunt counties were revised to be in conformity with the field notes of Rains county. Acts 1870, pp. 2 and 42. As revised, the southwest corner of Hopkins county was to be on "the north line of Rains county" at the west end of "the McMillan line." As to Hunt county, the second, third, and fourth calls were:

"Thence south to the north line of Rains county; thence with said line west four miles; thence in a southwestern direction to Hooker's Mill on the east branch of Sabine river."

The lines bringing about the suit are the lines defined in the acts, pertaining to Hunt and Rains counties, reading:

"Thence west with said line [referring to the McMillan line at the west end of which is fixed the southwest corner of Hopkins county] four miles into Hunt county, thence about southwest in a direct line to Hooker's Mill on the east branch of Sabine river."

The issues submitted to the jury, and the answers made thereto, are as follows:

"Question 1. Prior to the year 1895 had the east boundary line of Hunt county, adjoining the west boundary line of Rains county, been surveyed and marked? Answer: Yes.

"Question 2. Was said surveying and marking made on the line as alleged by plaintiff or on the line as alleged by the defendant? Answer: Defendant.

"Question 3. Prior to the year 1895 had there been any dispute or uncertainty as to location of the east boundary line of Hunt county, adjoining the west boundary line of Rains county? Answer: No.

"Question 4. Prior to the year 1895 had the said boundary line between the two counties been recognized as a definite line by the officials of the two counties? Answer: Yes."

The evidence supports the verdict, and their findings are adopted. Upon this verdict the court entered judgment establishing the boundary line in question, as follows: Beginning at a "stake on the north side of Sabine river near what is known as the old Hooker Mill"; thence north 15 degrees east to a point in the W. P. Buzan survey where a line so run will intersect a line running west from the southwest corner of Hopkins county at the west end of a line known as "the McMillan line." The evidence is referred to in the opinion.

Clark & Clark, of Greenville, and C. A. Sweeton, of Houston, for appellant.

McMahan & Dohoney, of Greenville, for appellee.

LEVY, J. (after stating the facts as above).
[1] In the light of the pleadings and the evidence it becomes necessary to determine first whether or not the boundary line between the two counties has once been surveyed and established on the ground under authority of law so as legally to settle that question. For it is expressly provided by article 1385 of the Statutes, on which the right to bring this action is based, as follows:

(1) "If it shall be found in any such cause that the boundary line in question has been heretofore established under the law then in force, the same shall be declared to be the true line, and shall be resurveyed and established as such." * * * .
(2) "And if, in the trial of any such cause, it shall be found that the boundary line between the counties involved has never been established and marked, or, if marked, has become indefinite and undefined, said court shall have power to re-establish the same and order it marked."

And it is the firmly settled rule that a court has no power to direct another survey to be made and thereby establish another county boundary line different from the one established at some former period, when a county line has been once run, marked upon the ground, and established "in accordance with law." Jones v. Powers, 65 Tex. 207; Pecos County v. Brewster County (Tex. Civ. App.) 250 S. W. 310; Lampasas County v. Coryell County, 27 Tex. Civ. App. 195, 65 S. W. 67.

[2, 3] The county of Rains was created in 1870. At that time provision for organization of a new county and for surveying and marking the lines on the ground in the first instance was usually made in the act of the Legislature creating the county. In such acts provision was made for running the lines defined in the act by commissioners, who were empowered to employ a competent surveyor to do the work. And under the general statutory law in force it was only in case the method of surveying on the ground by the commissioners was such as not to place the line or lines on the ground, in the first instance, in a position "sufficiently special and well ascertained," that the county or counties interested could resort to the general statutory method of having the true line run out again and marked anew on the ground by joint surveys made by surveyors respectively representing the counties. Article 1057, P. D. Further, as provided in that article, if the particular act did not provide for commissioners to do so, then the joint survey made by surveyors was the initial step for tracing and marking the lines on the ground in the first instance, and that method was to be final. In this case the act creating Rains county did make provision

for its organization, and for ascertaining, surveying, and marking the boundaries on the ground. By the act five commissioners named therein were expressly given "full powers to organize said county, to employ a competent surveyor to run the lines of said county, and, as early as practicable, to ascertain the center of said county," etc., "and to divide the county into five precincts," etc. The running out of the ground of "the lines of said county" and the partitioning of the territory into precincts are necessary steps in the process of organization of a new county. And "the lines of said county" inclosed the particular territory set apart to the new county out of the territory of the original counties. The proceedings of the commissioners in establishing the boundaries would not be wholly ex parte on the part of the new county of Rains. In so executing the command of the Legislature the commissioners named in the act became and were the agents of the Legislature, and not of the new county or any of the original counties. The consent neither of Hunt county nor of any of the original counties was necessary in order for the commissioners to run out and mark on the ground "the lines of said county" defined by the act, as directed by the Legislature. Hence the acts of the commissioners, being under authority of law, in legal effect would be binding equally on all the counties affected as well as on the public generally, unless in running out the boundaries defined in the act they failed to place the lines on the ground in a position "sufficiently special and well ascertained."

[4] That the commissioners named in the act did in fact cause "the lines of said county" to be designated, surveyed, and marked on the ground in pursuance of the act of the Legislature is not a debatable question in the record. It is affirmatively shown, and there is no evidence to the contrary, that the commissioners employed Perry Taylor, a competent surveyor, to run the lines, and that he, with the assistance of all the commissioners and others, surveyed and ran out the lines as provided and directed by the act, and actually marked and established upon the ground the localities of the lines. This was done in the month of June, 1870, after the act took effect on June 9, 1870. The testimony was by witnesses competent to testify thereto, living in the locality, personally acquainted with the surveyor and the commissioners, having knowledge of what they were doing at the time, seeing them in the process of surveying, and acquainted with the marking made on the ground. One of the witnesses actually accompanied the surveyor and the commissioners, saw the lines run and the corners marked and established, knew the land surveys the lines passed through, and personally knew the owners and occupants of most of the land surveys and the known objects reached. As testified, the line actually run and established on the ground by the surveyor and commis-

sioners, as pertains to the line in controversy, began at a point in the Wm. P. Buzan, which survey was then and is now existing. A stake was driven into the ground at this point, at between 50 and 100 feet north of a ravine, and a large white elm tree located near the stake, bearing "a little east of south," was marked on the side next to the stake "R. C." This is the northwest corner of Rains county as claimed. From this point the line was run on the ground in a southwesterly direction across the east end of the Henry Riley survey then existing, and through the east end of the Marshall Crawford survey, through the Samuel Hooker survey, through the James T. Hooker survey, through the Robert Harris survey, through the W. D. Winston survey, across the Hooker creek, and passing by what was then known as the Hooker schoolhouse on the W. D. Winston survey, through the James T. Hooker survey to Hooker's Mill, located on the east bank of Sabine river.

[5] The evidence, though, concerning the running out of the lines by the commissioners, is entirely oral. A map or plat of the lines so run and marked does not affirmatively appear to have been returned by the surveyor or the commissioners. If they ever made and returned one it was destroyed at the time the courthouse of Rains county and all the county records were destroyed by fire in 1879. It does affirmatively appear that no map or plat directly made by such surveyor or commissioners was ever filed in the general land office. However, the fact of not making and returning for record a map or plat, if they did not do so, would not make invalid the acts of the commissioners, since the act appointing them and the statutory provisions in force did not require nor enjoin upon them the duty to do so. Therefore if it be true, as found by the jury, that the boundary was run out and marked on the ground in 1870, as alleged by appellee, then this was done in accordance with the law then in force.

[6, 7] Did the surveyor in 1870 place the line on the ground in a position "sufficiently special and well ascertained" and exactly in the localities alleged by Rains county? The jury, on the evidence, determined the issue as to localities in favor of Rains county. This finding of the jury, sufficiently supported by the evidence, would fix the northwest corner of Rains county, as marked by the commissioners, at a point in the Wm. P. Buzan survey, thence east to the west end of the McMillan line, and continuing east with that line to the northeast corner of Rains county. The McMillan line as run on the ground in 1863 is conclusively, without doubt, shown in the record. The McMillan "west end" is conclusively shown to be on the east line of Hunt county and at the southwest corner of Hopkins county. The post oak called for at this point by the McMillan survey is there now, and identified by those competent to testify there-

to. It is described as a "post oak marked S. W. and bears N. 88 E. 395.5 varas," meaning from the west end of the McMillan line and the southwest corner of Hopkins county. The "Wm. P. Buzan survey" then existing, and now, was identified and located by those competent to know. Also the "Hooker mill" on the east branch of Sabine river is clearly located on the ground. The precise point or place of the call, "west four miles into Hunt county," is fixed in the Wm. P. Buzan survey. When that point is once fixed on the ground the next call is easily determined, since it must be found by running "thence in a southwestern direction to Hooker's mill on the east branch of Sabine river." All these markings are definite and known objects, existing and located on the ground by the evidence beyond doubt. In fact, there is no dispute about the true location of these objects and their locality. As held:

"When a county line has been once run, marked upon the ground and established in accordance with law, it cannot be said to be indefinite. It may be incorrect, but nevertheless well defined. None of the statutes seem intended to give power from time to time to county commissioners' courts to correct what may have been incorrect in the establishment of a county line on the ground; but seem intended to give a means by which the line or lines may be made definite and certain, and when so rendered, in accordance with the statute, whether correctly run and marked or not, the statutory declaration that 'the line so run and marked shall thereafter be regarded as the true boundary line between the counties,' ought to be given full effect and held as a prohibition to any further action looking to the establishment of some other line." Jones v. Powers, 65 Tex. 207.

[8] But by taking the point established in the "Wm. P. Buzan survey" as marked by the commissioners as the west end of the third call, and as the northwest corner of Rains county, it may be seen that it measures on the ground "into Hunt county" more than "four miles west" of the west end of the McMillan line or the southwest corner of Hopkins county, and to which corner a part of the east line of Hunt county ties. It is at least, according to the evidence, 4.94 miles distant. The call was purely for course and distance, and the line as run was clearly incorrect in point of distance. The line is extended nearly a mile beyond the call designated in the act. It evidently was not contemplated, in the original location of the lines on the ground by the commissioners, to make a survey above the statutory limit. They had no discretionary power to arbitrarily extend the length of a line fixed by the act, but were authorized to designate, survey, and mark the boundary line as defined in the act, in substantial, although not precise, compliance therewith. The extension of the line was evidently occasioned, as must be assumed, by a mere mistake of measurement on the ground. There-

fore, does legal objection exist to the maintenance of the present suit to relocate the boundary defined by the act upon the ground that the original marking of the line was in substantial extension above the real call? It is evident that the question must turn upon whether or not article 1400, Rev. Stat., is applicable to the case.

[9] Article 1400, enacted in 1895 as article 822, reads as follows:

"The county boundaries of the counties in this state as now recognized and established are adopted as the true boundaries of such counties, and the acts creating such counties and defining the boundaries are continued in force."

[10] As held, the article is in general terms and applies generally to official location of boundaries, and is not limited to the line or lines established on the ground in accordance with the statute providing, in specified cases, for joint surveys made by surveyors respectively representing the counties. Hale County v. Lubbock County (Tex. Civ. App.) 194 S. W. 678. The words "as now," as used, mean "till now," or "until the present time" of the date of the act. The article clearly implies a wrong boundary was "established" on the ground in the first instance, to indicate where the statutory boundary should be run, and that it was thereafter "recognized" or treated as the true boundary of the counties affected "until the present time" of 1895. No limitation is placed upon the error of the survey of the "boundary" so "recognized and established" till "now," in 1895. And to authorize the courts to place a limitation upon the erroneous excess allowable above the statutory line, it must appear in the given case, as a matter of law, to be a grossly excessive annexation of territory, in violation of law as affecting a reduction of the area of the county affected below the constitutional requirement then existing.

[11, 12] Such conditions do not appear here. Hence, was the line as established "recognized?" No proceedings leading to a relocation of the line were had by the commissioners' court of either of the counties from the time it was established at a point in the Buzan survey in 1870 to a time just before the institution of this suit in 1923. This is a significant fact of passive recognition. And the evidence affirmatively shows that the commissioners' court of each of the counties officially acted in reference to the line in establishing precincts, voting precincts, and laying out roads. Each county, though separately, exercised jurisdiction up to the limits of the line. Votes cast by the residents along that line were returned to and counted by the officers. Jurors were selected with reference to the line. Taxes were rendered and assessed with reference to the line, and the commissioners' court approved the tax rolls. Deeds to land were registered and schools were located with reference to the line. All this

evidence was sufficient to show a recognition of the line by the commissioners' courts of the two counties, and by the officers charged with duties respecting boundaries, for many years both prior to and since 1895, and to authorize the verdict of the jury. And, too, the map of Rains county originally made in the general land office in 1873 by the commissioner of the state, and that has been in use in that office from that date to the present, shows the northwest corner of Rains county to begin in the Wm. P. Buzan survey; thence east to the southwest corner of Hopkins county, and on to the northeast corner of Rains county. The abstract of land titles authorized by law and published by the general land office shows portions of the surveys through which the line passes in Rains county, and the other portions of these surveys in Hunt county. This would go to show that the line as proven to be run by the commissioners had been also recognized by the general land office for many years as the boundary line between the two counties. The mere fact that there was some confusion with respect to whether parts of certain surveys were in one county or the other, or whether the line runs by certain farms or localities, would not affect the operation of the article. Hence it would appear that the facts of this case come within the terms of the article; and its terms should be held conclusive of the appeal, unless, further, as urged, the Constitution does not admit of its application to the special facts, for to so apply it would effect a deduction of territory from one existing county and add it to another existing county.

[13] The present constitutional provision claimed to be applicable is section 1, subd. 3, of article 9, reading:

"Section 1. The Legislature shall have power to create counties for the convenience of the people, subject to the following provisions: * * *

"Third. No part of any existing county shall be detached from it and attached to another existing county until the proposition for such change shall have been submitted, in such manner as may be provided by law, to a vote of the electors of both counties, and shall have received a majority of those voting on the question in each."

This present provision appears in the Constitution adopted in the year 1876, and was not in the Constitution of 1869 in force at the time of the creation of Rains county in 1870.

Whether or not the article in question if applied to this case falls within the prohibition of the particular provision of the Constitution depends upon the character of the relief it provides. It does not evidence the intention of the Legislature by amendatory act to rebound existing counties by detaching territory from the one county and attaching it to another. The manifest intention of the Legislature was the legalization of boundaries formerly established on the ground, to indicate where the statutory lines should be run, and which were thereafter "recognized" or treated as the boundaries, even though such boundaries be subsequently discovered to be incorrect or not the true boundary lines. The effect is merely a continuation of the boundaries "recognized and established" at the time of the origin of the counties and survey made on the ground as a method of defining the boundaries. As previously construed and applied to the cases, the article is "a validating or curative act merely." Hale County v. Lubbock County (Tex. Civ. App.) 194 S. W. 678; Pecos County v. Brewster County (Tex. Civ. App.) 250 S. W. 310; Stephens County v. Palo Pinto County (Tex. Civ. App.) 155 S. W. 1006, and other cases.

[14] As stated in the case of Stephens County v. Palo Pinto County, supra:

"It was the purpose of the 'act,' to quiet all controversies over county boundary lines where, at the time the Act took effect, such lines were established (that is definitely marked and known) and recognized, irrespective of the accuracy of such surveys. It is a wholesome statute, and should be liberally construed and enforced."

[15-19] The very object of curative or confirmatory acts is to give effect to the intention of parties to enable them to carry into effect that which they have designed and attempted, but which failed of its expected legal consequences only by reason of some statutory disability or some irregularity in their action. The rule in regard to curative statutes is that if that which is legalized is within the authority of the Legislature to cure or modify by a previous statute, if enacted, it may do so by a subsequent one. 2 Lewis Statu. Con. p. 1229; Cooley on Con. Lim. p. 531. But of course the Legislature cannot validate an act that it is forbidden by the Constitution to authorize in the first instance. Hutcheson v. Storrie, 92 Tex. 685, 51 S. W. 848, 45 L. R. A. 289, 71 Am. St. Rep. 884. This then depends upon whether the article was intended to have retrospective operation. For if the article was to have retrospective operation only, which we think to be the fact, the Legislature could, as applied to the present case, have changed or reformed the lines of the two counties in 1870 without in any way intrenching on the Constitution, except in so far as reducing either county below the area of 700 square miles. The present provision of 1876 was not in the Constitution of 1869, which was in force up to 1876. And such act, if passed, would not have interfered with any vested right of Hunt county. A county has no vested right in county boundaries. Laramie County v. Albany County, 92 U. S. 307, 23 L. Ed. 552; Cooley on Con. Lim. p. 266. As laid down in Milam County v. Bateman, 54 Tex. 153:

"Counties in their relation toward the state may be viewed in a twofold aspect: One, which

pertains to their political rights and privileges; the other, to their rights of property. Over the former, the Legislature as the representative of state sovereignty can exercise absolute power unless restricted by the organic law. * * * Hence the political rights and privileges delegated to counties are not within the constitutional prohibitions against retroactive laws and those which impair vested rights."

[20-23] The Legislature has "full power over the subject" of county boundaries, subject only to constitutional limitations upon that power. Trinity County v. Polk County, 58 Tex. 321. An unauthorized survey of county lines is a subject-matter of validation, effective from its origin. Wright v. Jones, 14 Tex. Civ. App. 423, 38 S. W. 249. Ordinarily curative statutes are by their very nature intended to act upon past transactions, and are therefore wholly retroactive. 36 Cyc. p. 1221. And, the language used in the article being considered, by fair implication it is intended that it should react back and relate to past cases, validating such boundaries from the date that they were "established and recognized." That is the test according to the rule laid down. Rockwall Co. v. Kaufman Co., 69 Tex. 172, 6 S. W. 431; Mellinger v. City of Houston, 68 Tex. 36, 3 S. W. 249. In this view, the article would be applicable to the present case and would not be subject to the constitutional objection, for relating back, as the article does, to the time of origin of the establishing the boundary "recognized," the Constitution of 1869 and not of 1876 would determine its application. Especially so since the act of the commissioners in fixing the particular line on the ground, as done, was a mere irregularity in exercising the powers conferred, and not of absolute invalidity of any legislative authority to lay out the lines.

[24] A narrow application of the article, not plainly required by its terms and intention, would not be in the public interest. In sound policy a county line that has been located and acquiesced in for many years, as here, should not be changed unless expressly required by law to be done, even though such line was not the correct one in the first instance. For interminable confusion would result from the change of conditions of such long standing. Road and school bond issues would be affected, as well as individual privileges and status in respect to the line.

We have considered all the assignments of error, and conclude that they should be overruled.

The judgment is affirmed.

HODGES, J. (dissenting). The affirmance of the judgment in this case is based mainly upon the validating act of 1895 referred to in the opinion of Justice LEVY. It is, however, apparently conceded that in the original survey of Rains county the west boundary line was not correctly run according to the field notes contained in the act creating that county. The northwest corner was established approximately one mile west of where that corner should have been under the terms of the act. In other words, instead of running the north line of Rains county four miles into Hunt county, the surveyor ran it nearly five miles and there located the northwest corner of Rains county. He then ran south, or in a southerly direction, to the place called for in the act as the southwest corner of Rains county. The testimony was probably sufficient to warrant a finding that this original line remained unchanged and was recognized by the officials of both counties as the true west boundary line of Rains county for many years and up to the time of the passage of the validating act of 1895. In 1870, when Rains county was created, the Legislature had the power to establish the west boundary line as marked by the surveyor on the ground. Under the Constitution then in force the Legislature also had the authority to change the boundary lines of existing counties without the consent of the qualified voters of either county affected. But in the adoption of the Constitution of 1876 the following restriction was imposed:

"No part of any existing county shall be detached from it and attached to another existing county until the proposition for such change shall have been submitted, in such manner as may be provided by law, to a vote of the electors of both counties, and shall have received a majority of those voting on the question in each." See article 9, § 1, Constitution of the state of Texas.

At the time that provision became effective the wedge-shaped strip of territory which had been erroneously included by the surveyor within the limits of Rains county was either legally a part of Rains county or a part of Hunt county. Both of those were "existing counties" at that time, and this disputed strip was bound to be in one or the other. If it was then a part of Rains county it became such, not by virtue of the law creating that county, because the law did not include that territory, but by the act of the surveyor in running the line and the subsequent recognition of that line by the county officials. If the survey and its recognition were alone legally sufficient to establish the boundary line at that place, then the act of 1895 was not required to make legal that which was already legally established, and in so far as this controversy is concerned that act would be merely declaratory of a fact which was already legally established. On the other hand, if the disputed strip was never before legally a part of Hunt county, although actually claimed by Rains county, when the validating act was passed, then the act of 1895 did not affect the situation, because the Legislature had no authority to change the boundary line without the consent

of the voters of both Hunt and Rains county. A line between two adjoining counties cannot be changed without "detaching" territory from one and "attaching" it to the other; and such "detaching" and "attaching" could not at that time be done without the consent of the voters of both 'counties affected. Hence if the validating act of 1895 is needed to make the erroneous original survey the true boundary line between Rains and Hunt counties, the appellee is relying upon a law which the Législature had no power to pass.

The exercise of that power at that time is justified in the opinion of the majority by calling that act a curative one designed to have a retroactive effect. The argument is made that if in 1879, when Rains county was created, the Legislature had the power to place the line where the surveyor ran it on the ground, the Legislature could in 1895 validate what had previously been done without legal authority. In support of that proposition reference is made to cases and textwriters which say, in effect, that in the absence of intervening property rights the Legislature may do retroactively what it had the power to do in the first instance. As a general proposition that is correct, but it cannot be applied to the facts of this case. Had there been no change in the organic law of the state restricting the power of the Legislature to alter county boundaries, undoubtedly the Legislature could have validated an illegal survey. But between the time Rains county was created and the passage of the act of 1895 the power of the Legislature had been restricted, and the authority to alter the lines of existing counties was made conditional upon the assent of the people of those counties. It will be found that in every case where the proposition relied on by the majority is approved in the authorities cited there had been no change in the legislative authority between the date of the original act and the time when the retroactive or curative statute was passed. The Legislature could not, under the guise of validating a former survey, establish a boundary line at a place where it could not be located without the consent of the people affected. The Legislature can never do indirectly that which it has no authority to do directly.

It is shown by the record that Hunt county is seeking to establish the true boundary according to the field notes of the act of 1870. That, in my judgment, should be the established boundary between the two counties, and for that reason I think the judgment of the trial court should be reversed and judgment here rendered in accordance with the prayer of Hunt county.

On Motion for Rehearing.

LEVY, J. [25] The appellant excepts to the conclusion of the majority of the court that article 1400, being a curative act entirely, could be made applicable to the facts of the present case without violating the terms of the present constitutional provision. It is not insisted that the act is prospective in effect, or that it is not a curative act entirely, or that the Constitution forbids or denies the power to the Legislature to pass the curative act altogether. The precise contention is that there is no present power in the Legislature to pass a curative act that could be made applicable to the facts of this case, and therefore article 1400 could not be applicable. Necessarily any legal objection, as urged, to the application of the article to the facts must rest, we think, upon the ground that the act of the commissioners in establishing the lines was of absolute invalidity, and not an. act imperfectly done under authority. For, if the act of the commissioners in establishing the lines, as done, was merely an irregularity or imperfectness in executing the previous legislative authority. to lay out "the lines of said county," then, in that case, the application of the curative statute would not be of the same import as conferring original authority upon the commissioners, never granted in the first instance. It is only in case the act of the commissioners could be said to be of absolute invalidity that the application of the curative statute, although relating to the time of doing the act, would be of the same import as conferring original authority upon the commissioner, having origin at the time of the passage of the curative law. In the latter case only would the limitation upon the present power of the Legislature to change county lines be applicable. Sykes v. Mayor and Aldermen of Columbus, 55 Miss. 115; Swartz v. Borough of Carlisle, 237 Pa. 473, 85 A. 847, Ann. Cas. 1914B, 458; Katzenberger v. City of Aberdeen, 121 U. S. 172, 7 S. Ct. 947, 30 L. Ed. 911. See 15 C. J. § 28, p. 405. As determined in the original opinion, the article would be applicable to the present case and would not be subject to the constitutional objection, "since the act of the commissioners in fixing the particular line on the ground, as done, was a mere irregularity in executing the powers' conferred, and not of absolute invalidity, as independent of .any legislative authority to lay out 'the lines of said county.'" The commissioners appointed in 1870 had express legislative authority to "divide the county into five precincts" and to run out on the ground "the lines of said county." In so executing the command of the Legislature the commissioners actually surveyed out the boundary lines on the ground and established them, but fixed the corner of the third call in the "Wm. P. Buzan survey," actually measuring, as later developed, "4.94 miles," instead of "four miles," west of the southwest corner of Hopkins county. This particular error of distance was occasioned, as we must assume, merely by mismeasurement

on the ground. A mistake did not occur in the first and second calls, nor in the fourth call except so far as the consequence of beginning that call in the "Wm. P. Buzan survey." Therefore, although the location of the corner of the third call at that point was erroneous in fact, yet it was purely the result of measurement on the ground, imperfectly done under authority to establish on the ground "the lines of said county." The lines so "established" in 1870 were "recognized" as the county boundaries for years afterwards, not as established independent of any legislative authority, but as established in pursuance of legislative authority conferred upon the commissioners to do so in the manner done. According to the terms of article 1400, the "act" creating the county in the first instance is "continued in force" without redefining the boundaries.

A majority of the court is of the opinion that the motion should be overruled, but a final ruling thereon is withheld until the question in issue can be certified to the Supreme Court. It is accordingly ordered that the proper certificate be made to the Supreme Court in compliance with the motion of appellee.