## GARZA COUNTY v. LYNN COUNTY et al.
### No. 889.

Court of Civil Appeals of Texas. Eastland.

Oct. 2, 1931.

Rehearing Denied Oct. 30, 1931.

628

Bean & Klett, of Lubbock, and Leon Moses, of McKinney, for appellant.

Vickers & Campbell, L. A. Howard, and Lockhart, Garrard & Brown, all of Lubbock, W. W. Price and Geo. Neill, both of Brownfield, Carl E. Ratliff, of Levelland, N. C. Outlaw, of Post, Green Harrison, of Dallas, and Loyd R. Kennedy and J. L. Winder, both of Morton, for appellees.

FUNDERBURK, J.

This suit was originally instituted to locate and define the common boundary line between Lynn and Garza counties, which theretofore had never been located or defined or marked upon the ground. Because of the effect of the establishment of such line upon other interested counties, the counties of Lubbock, Yoakum, Cochran, Hockley, Crosby, Terry, and Kent in one way or another be-

came parties. The case was tried before the judge without a jury. At a time when the only parties to the suit were Garza, Lynn, Terry, Lubbock, Crosby, and Hockley counties, an application was made by Garza, Lynn, and Crosby counties to have the court appoint a disinterested competent surveyor "to run out, mark and define the corners and lines in litigation, as shown by the pleadings." The court appointed W. J. Williams to do the surveying. Williams, in company with and assisted by W. D. Twichell, a surveyor representing Garza county, and R. E. Estes, a surveyor representing Lynn county, made an extensive survey and filed a report which was admitted in evidence. The three surveyors were witnesses at the trial. We interpret their testimony as showing that they agreed upon all the material facts which, independently of the questions of law involved, are deemed determinative of the issues in the case. They agreed that the S. E. corner of lower Brazos Indian Reserve was a recognized and marked corner upon the ground; that beginning 6 miles east of said marked corner, and running thence north 30 miles and thence west 30 miles, as called for in the Act of the Legislature of 1858, defining the boundaries of Young county (Acts 1856, 4 Gammel's Laws, p. 459), a point would be reached, the location of which is 691.1 varas east and 1,078.5 varas south of a well-marked corner, being the N. W. corner of Young county, as established and marked by Swindell in 1859 and herein designated as Swindell's N. W. corner of Young county. The said point, 691.1 varas east and 1,078.5 varas south of Swindell's N. W. corner of Young county, will be referred to as the Statutory N. W. corner of Young county. The testimony of the surveyors agreed, and the trial judge found that a line run west from either the Swindell's N. W. corner or the Statutory N. W. corner of Young county for a distance of 150 miles— thereby allowing 30 miles for the north line of each of the counties of Throckmorton, Haskell, Stonewall, Kent, and Garza—would end at a point east and south of the S. E. corner of Lubbock County, as established and marked by Jones in 1892, and herein designated as the J. B. Jones S. E. corner of Lubbock county. The Act of the Legislature of 1876, dividing Young and Bexar territories into counties and defining the boundaries thereof (8 Gammel's Laws, p. 1070), required the location of the N. W. corner of Floyd county at a point which can be definitely located with reference to the N. W. corner of Young county, as follows: Beginning at the N. W. corner of Young county; thence north 30 miles; thence west 60 miles; thence north 30 miles: thence west 90 miles. It was undisputed that if the N. W. corner of Floyd county be located as above provided, by beginning at the Statutory N. W. corner of Young county, the par-

allel of latitude passing through said Statutory N. W. corner of Young county and the meridian of longitude passing through the N. W. corner of Floyd county would intersect at a point 758.4 varas south and 846.3 varas west of said J. B. Jones S. E. corner of Lubbock county, said point being also 956.3 varas south, and 101.6 varas east of a concrete monument set around an iron pipe, referred to in Williams' report as the west S. E. corner of Lubbock county, and also sometimes designated as Harris' S. E. corner of Lubbock county, and which will hereinafter be referred to as the concrete monument. It was also undisputed that, if the N. W. corner of Floyd county be located as above stated, except to begin at Swindell's N. W. corner of Young county instead of the Statutory N. W. corner of Young county, the parallel of latitude passing through said Swindell's N. W. corner of Young county, and the meridian of longitude passing through the N. W. corner of Floyd county as so located, would intersect at a point 317.6 varas north and 1,548.9 varas west of said J. B. Jones S. E. corner of Lubbock county, said point being also 601 varas west and 122 varas north of said concrete monument.

The trial court found, and the finding appears to be unchallenged, "that Lubbock County and Crosby County have, for many years, recognized the east boundary line of Lubbock County, as established by J. B. Jones in 1892, as the dividing line between said Lubbock and Crosby County." The court also found that the south boundary lines of Baylor, Lamb, Terry, Floyd, and Motley counties were well established lines upon the ground, and had been for many years recognized as established lines. While the last-mentioned finding was challenged by proper assignment, the assignment has not been briefed. We therefore take it to be correct.

Upon these facts the surveyors testified that they would locate the N. W. corner of Garza county each at a different place. Estes would locate it at a point 758.4 varas south and 1,588.9 varas east of said J. B. Jones S. E. corner of Lubbock county. Estes and Williams regarded the Statutory N. W. corner of Young county as the proper beginning point to make such location, and Twichell was of opinion that Swindell's N. W. corner of Young county was the proper point to begin. Estes believed that the N. W. corner of Garza county should be located by a measurement due west from the Statutory N. W. corner of Young county for a distance of 150 miles. Twichell would locate said corner at the point 317.6 varas north and 1,548.9 varas west of the J. B. Jones S. E. corner of Lubbock county, and Williams at the point 758.4 varas south and 846.3 varas west of said J. B. Jones S. E. corner of Lubbock county. The difference of opinion between Williams and Twichell as to the point at which the N. W. corner

of Garza county should be located was solely the result of their difference of opinion as to whether the Statutory N. W. corner of Young county or Swindell's N. W. corner of Young county should be the beginning place for locating the N. W. corner of Floyd county. It therefore appears that the only material difference of opinion of any of the surveyors was the result of their different interpretations of the law creating the counties involved in the controversy, and other counties.

The material provisions of the trial court's judgment were as follows: The J. B. Jones S. E. corner of Lubbock county was decreed to be the N. W. corner of Garza and N. E. corner of Lynn counties, as well as the S. W. corner of Crosby county. The N. E. corner of Garza, the N. W. corner of Kent, and S. E. corner of Crosby counties was decreed to be a point to be fixed by measuring due east from the J. B. Jones S. E. corner of Lubbock county for a distance of thirty miles. The extension west to the New Mexico state line of the J. B. Jones south line of Lubbock county, as marked upon the ground, was decreed to constitute the dividing line between the counties of Lubbock, Hockley, and Cochran on the north, and Lynn, Terry, and Yoakum on the south. The S. W. corner of Lubbock, N. W. corner of Lynn, N. E. corner of Terry, and S. E. corner of Hockley counties was decreed to be a point 30 miles west of the J. B. Jones S. E. corner of Lubbock county, being the J. B. Jones S. W. corner of Lubbock county as marked on the ground. The N. W. corner of Terry, S. W. corner of Hockley, N. E. corner of Yoakum, and S. E. corner of Cochran was decreed to be a point 30 miles west of the said J. B. Jones S. W. corner of Lubbock county. Due north and south lines along the meridians were decreed to be run north and south from the corners thus established to mark the east and west boundary lines of the several counties, except no provision was made as to the east boundary line of Crosby and Kent counties, or the west boundary lines of Yoakum and Cochran counties. The judgment recites that the N. E. corner of Garza and N. W. corner of Kent counties (as decreed to be established) was not marked upon the ground; that the north boundary line of Terry, the south boundary line of Hockley, the west boundary line of Yoakum, and south boundary line of Cochran counties had never been marked or established on the ground; that the boundary lines between Terry and Yoakum counties, and between Hockley and Cochran counties, were not marked upon the ground.

Appellant contends that there was no evidence to support the finding and judgment that the S. E. corner of Lubbock county, as marked by monument made by J. B. Jones in 1892 and known as the J. B. Jones S. E. corner of Lubbock county, is the correct location of the N. W. corner of Garza and N. E. corner

of Lynn counties, as well as the other adjudications of corners and lines based thereon.

The question, we have concluded, is wholly dependent upon the proper construction to be given R. S. 1925, art. 1606. If that statute does not control the question, then we are of opinion that appellant's contention is correct and that there was no evidence to support the court's finding and judgment. Independently of said statute, the real issue involved and necessary to be supported by the evidence, in order to warrant the judgment rendered, would be whether the N. W. corner of Garza county, if correctly located, as required by said act of 1876, creating the same, is at the J. B. Jones S. E. corner of Lubbock county. We find no evidence to show that such is the fact.

The following sketch will aid in the understanding of the questions involved:

act, it seems to us, affords entirely convincing evidence that the Legislature contemplated that the constitutional specifications could be complied with by establishing counties whose north and south lines were each exactly 30 miles in length, and whose east and west lines were exactly 30 miles in length, and running due north and south; that is, with meridians of longitude. This, we think, is shown very plainly by the directions for locating many of the counties. For example: Jones county was required to be located by beginning at the S. W. corner of Shackelford and the N. W. corner of Callahan county; thence west 30 miles; thence north 30 miles; thence east 30 miles; thence south 30 miles to the place of beginning. It is a mathematical impossibility to locate Jones county on the ground as thus directed. It could only be located on the ground as so directed if the

The act approved August 21, 1876, hereinabove referred to, creating the counties in question and other counties, sought to carry out the constitutional mandate of section 1, art. 9, of the Constitution of 1876, that in creating new counties "no new counties shall be created with a less area than nine hundred square miles, in a square form, unless prevented by pre-existing boundary lines." The

ground was a plane surface. It cannot be located upon a spherical surface, as the earth is, without disregarding calls for course or distance. The east and west lines called for are not parallel. This is readily understood from a moment's reflection when it is considered that their extensions, both north and south, would intersect at the Poles. Therefore, the north and south lines could not both

be exactly 30 miles in length. It is apparent to us that the Legislature, in directing the location of the several counties, overlooked the fact that they were not to be located upon a plane surface, but upon a spherical surface. The result of the failure to take into account this important fact is that some of the directions cannot be literally followed. As said, it would be a mathematical impossibility to locate some of the counties just as directed. As to some others, if the directions for locating same may be literally followed, the counties would not contain 900 square miles, as required by the Constitution, or would be contrary to some more certain intent of the Legislature. Under these circumstances we have forced upon us the alternative of declaring the act of the Legislature void, or else of giving it a construction—in some instances directly contrary to its express provisions—that will make it practicable and conform to the Constitution, and at the same time to effect, to the greatest extent possible, the legislative intent.

■ We think the act unmistakably shows the intention of the Legislature, with certain exceptions, to locate most of the interior counties so that four counties would have one common corner. One such exception is to be found in the case of the counties of Collingsworth, Donley, Armstrong, Randall, and Deaf Smith, in relation to the tier of counties to the south, consisting of Childress, Hall, Briscoe, Swisher, Castro, and Parmer. The north line of Childress county is 23 miles; the south line of Collingsworth county is common with the north line of Childress county for the same 23 miles, but extends west to a full length of 30 miles, the result being that none of the interior counties in the one tier necessarily have common corners with the counties in the other tier. The same is true of the tier of counties in which Childress county is located, with reference to one to the immediate south, consisting of Cottle, Motley, Ford, Hale, Lamb, and Bailey counties. The south boundary line of Childress county is recognized by the act to be of uncertain length, but estimated at about 35 miles, while the north line of the adjoining county of Cottle is fixed by course to run with the south boundary line of Childress and by distance to stop at 30 miles. There is, therefore, shown an intent that the counties in one of these two tiers, except at the beginning and end, are not to have common corners with the counties in the other. It being our duty to give effect to the legislative directions, except only where it is impossible to do so, or where it is necessary to disregard same in order to effect a more certain intent or preserve the act from being unconstitutional, it will be seen that the calls for course and distance may be given effect as applying to the north lines of said counties of Cottle, Motley, Floyd, Hale, Lamb, and Bailey. But the calls directing the location of the S. W. corners of each of said counties at a point *south* of its N. W. corner and exactly 30 miles due west of the S. W. corner of the county to the east are impossible. Either the call for a given point or the call for direction must yield, one to the other. While ordinarily a call for a given point will control a call for course, that rule cannot be applied here without running counter to the Constitution and also the more certain intent of the Legislature to have four counties corner together. If the calls for a south course be made to yield to the call for the particular point, then the counties would have less than 900 square miles, as required by the Constitution. We think, therefore, the calls for south must control the calls for a point 30 miles due west of the S. W. corner of the county to the east. This will enable the interior counties below to have each its corners common with three other counties. The south line of each of said counties, and the corresponding north lines of the adjoining counties to the south, will not be exactly 30 miles, but in addition will include only the spread of the meridians at the particular latitude. Some of the counties, it is true, will be of greater area than others, but they will all conform to the constitutional requirement that they contain not less than 900 square miles and will be in a square form; at least as nearly so as it is practicable to lay them out upon a spherical surface. The theory under which Mr. Estes, one of the surveyors, would locate the corners and lines would result in few, if any, of the counties of an upper and lower tier having common corners, although in the act the calls for a common corner for four counties are numerous.

■ Our investigation leads us to conclude that, unless the question is controlled by R. S. 1925, art. 1606, the N. W. corner of Garza county, being also the S. E. corner of Lynn county, should be located as contended for by the witnesses Williams and Twichell, at the point of intersection of the parallel of latitude passing through the N. W. corner of Young county, and the meridian passing through the N. W. corner of Floyd county. The N. W. corner of Floyd county should, we think, be located for the purpose of determining the meridian by running the agreed courses and distances from the Statutory N. W. corner of Young county rather than from Swindell's N. W. corner. The act of the Legislature creating the counties in question does not so designate the N. W. corner of Young county as to show recognition of Swindell's corner. We think, therefore, the act must be interpreted as referring to the N. W. corner as correctly located according to the previous act of the Legislature defining the boundaries

of Young county, which the undisputed evidence in this case shows to be the Statutory N. W. corner. Under this view the N. W. corner of Garza county and the S. E. corner of Lynn county should be located 758.4 varas south and 846.3 varas west of the J. B. Jones S. E. corner of Lubbock county, as marked upon the ground; the said point being also 956.3 varas south and 101.6 varas east of the concrete monument.

■ The most difficult question we have found it necessary to consider is the effect, if any, to be given to R. S. 1925, arts. 1606 and 1591. Article 1606 provides: "The county boundaries of the counties in this State as now recognized and established are adopted as the true boundaries of such counties, and the acts creating such counties and defining the boundaries are continued in force." This provision first appeared in R. S. 1895, as article 822. In the 1911 revision it was article 1400. The relevant part of article 1591 (first enacted in 1897), reads: " * * * Provided, that if it shall be found in any such cause that the boundary line in question has been heretofore established under the law then in force, the same shall be declared to be the true line, and shall be resurveyed and established as such." Article 1606 has a number of times been construed and applied. The decisions, we think it may be correctly said, establish the proposition that, in any case of a disputed boundary line between two counties, where, prior to the bringing of suit to establish same, a line had been definitely marked on the ground, and had been recognized by the counties interested in same and by the Commissioner of the General Land Office as the true boundary line, said statutes require that same be adjudged to be the true boundary line, even though the undisputed evidence may show that it was not located as the act or acts of the Legislature originally required, provided, of course, the effect was not such as to contravene provisions of the Constitution such as required area, etc. Stephens County v. Palo Pinto County (Tex. Civ. App.) 155 S. W. 1006; Hale County v. Lubbock County (Tex. Civ. App.) 194 S. W. 678; Pecos County v. Brewster County (Tex. Civ. App.) 250 S. W. 310; Hunt County v. Rains County, 116 Tex. 277, 288 S. W. 805; Hunt County v. Rains County (Tex. Civ. App.) 7 S.W.(2d) 648; Travis County v. Williamson County (Tex. Civ. App.) 4 S.W.(2d) 610.

These decisions, it is believed, leave two questions which arise upon the record in this case, undetermined. They do not settle the question of whose recognition it is, of an established boundary line, that is necessary, in order for the statute to apply. Neither do they afford an answer to the question, directly nor upon principle, whether an incorrectly established and recognized line shall control the legal establishment of the lines of other counties which have never been established upon the ground, and which, of course, have never been recognized as true boundary lines.

Regarding the first question, the *recognition* referred to in the opinions has usually been that of the two counties interested in the particular line as a common boundary between them. Frequent mention is made in the same connection of recognition by the Commissioner of the General Land Office, without any suggestion as to its precise value or necessity. As to the second question, no decision which we have found contains an intimation as to whether or not an unmarked and unrecognized boundary line which alone could not come under the provisions of article 1606 must, in the legal establishment thereof, be made to yield to incorrectly established and marked lines of other counties which have been recognized by the counties between which such marked lines run and perhaps by the Commissioner of the General Land Office.

■ Article 1606, it will be observed, contains two provisions which literally are contradictory, when applied to any boundary line defined in the act creating a county and which has been established and recognized in a different location. It is first provided that: "The county boundaries of the counties in this State as now recognized and established are adopted as the true boundaries of such counties." So much of the statute standing alone would have the effect of validating every county boundary line which had been established and recognized, including all those which had been incorrectly located upon the ground. As to the latter the lines defined in the creating acts would simply yield to the lines actually established and recognized, and would therefore cease to be the boundary lines. Unquestionably the Legislature had the power so to enact, unless the effect was to have the counties created in violation of the Constitution. But the statute further provided: " * * * And the acts creating such counties *and defining the boundaries* are continued in force." (Italics ours.) Is not the necessary effect of the last-quoted provision, upon all county boundaries which have never been established by being marked upon the ground, a legislative redeclaration that, in the establishment of such lines, they shall be located and marked just as directed in the acts creating the counties? If so, then the establishment of such lines cannot be affected by the fact that some other line has not been established as required by the act creating the county, even though under the first clause of the statute the recognition of such line makes it the true line.

Now, if full effect could be given to each provision of the statute so that all boundary

lines established and recognized would be true boundary lines, regardless of whether correctly located or not, and at the same time all boundaries not established be established just as called for in the acts creating the counties and defining the boundaries thereof, the statute would scarcely call for construction. Apparently all of the decisions up to this time have assumed such to be the case. So far as we know, no case has arisen which called for a consideration of the question as to whether both provisions could be given effect, each independently of the other, and, if not, which must yield to the other. We have these questions squarely presented here.

■ The record in this case demonstrates conclusively, we think, that both these provisions of the statute cannot be given independent effect, in any case, where a boundary line has been established and recognized at a demonstrably incorrect location. The Constitution in its grant of power to the Legislature to create counties and in its limitations upon that power, by clear implication, denied the Legislature the authority to create the territory of the state into counties in such a way as to leave small detached areas in no county at all. The constitutional direction to establish the counties in square form, and its recognition and provision for the impossibility of doing so in counties bordering state lines, very clearly denies by implication the power to exclude isolated scraps of land from the bounds of any county. But to undertake to give both provisions of article 1606 independent effect in this suit would result in doing just that. The N. W. corner of Garza and N. E. corner of Lynn counties would be at a point 758.4 varas south and 846.3 varas west of the S. E. corner of Lubbock and S. W. corner of Crosby counties. The south boundary lines of Crosby and Lubbock could not be the north boundary lines of Garza and Lynn. There would be an intervening area too small to constitute a county, and if so would not be in the form required by the Constitution. It is clear to us that one of the two provisions of article 1606 must yield to the other, so as to effect a conformation of one county to others. Which must be held to yield? It seems to be a question of whether or not the correct shall yield to the incorrect, or the incorrect to the correct. If the former is to be the rule, then the incorrect location of a line of one Northwest Texas county will require the incorrect location of every line of almost every other county that has never been established upon the ground. All statutory directions for locating lines would have to be disregarded. Interminable confusion would inevitably result. In attempting to conform to an error it would soon be found that there was more than one error. Then it would be a question of which of two or more errors should control, with the certain result that the county lines could not in all cases be run so as to conform to constitutional requirements.

The judgment of the trial court is evidently based upon a construction of the statutes in question, which gives controlling effect to established and recognized lines, and requiring lines which have never been established to conform thereto. By the judgment the N. W. corner of Garza and N. E. corner of Lynn is moved from the point fixed by the law creating said counties, as we construe it, to conform to an established and recognized corner located 846.5 varas east and 758.4 varas north of it. The result is that every line and corner are located at a different place than that called for in the creating act. The court found that the east line of Lubbock county and west line of Crosby county was an established and recognized line. The undisputed evidence showed it to be a north-south line, 30 miles in length. The S. E. corner of Crosby, the N. E. corner of Garza, and N. W. corner of Kent counties was directed to be located at a point 30 miles due east of the J. B. Jones S. E. corner of Lubbock county. No notice was taken of the north and east lines of Crosby county. It is apparent that, if said lines have never been established, there is no guide in existence for their location on the ground. The boundaries defined in the creating act would not fit. No other is given. The east line could not possibly be a north-south line. Suppose, as may well be possible, that either the north or east lines are established and recognized lines. What chance would there be that the east line, for instance, connected with the S. E. corner as fixed by the court? If it did not, what lines would then have to yield? Could one established and recognized line be made to yield to another, and, if so, upon what principle would it be determined which should yield? The judgment provides that the south line of Hockley county, an east-west line, should be 30 miles in length and that its east and west lines should follow meridians of longitude each to the north boundary line. As so decreed no straight line could be run connecting the N. E. and N. W. corners so as to inclose an area that would be either in square form or contain 900 square miles. It seems to us too plain for argument that the statutory calls for boundaries cannot be made to yield to incorrectly located lines of other counties.

■ It is perhaps unnecessary for us to undertake to declare the extent of the operation of the first provision of the article. It is clear to us that it can be given no effect in any case where, in establishing the boundaries of a county as defined in the act creating same which have never theretofore been established, and in doing so it becomes necessary to conform the boundaries of other counties.

634

It follows that, in our opinion, the judgment of the trial court should have decreed the common corner of Garza, Lynn, Lubbock, and Crosby counties to be as hereinbefore stated; that consistently therewith it should have directed the location of the S. E. corner of Crosby, the N. E. corner of Garza, and the N. W. corner of Kent counties at the point where the parallel of latitude passing through the N. W. corner of Garza is intersected by the meridian of longitude passing through the Statutory N. E. corner of Floyd county. The S. W. corner of Lubbock, the N. W. corner of Lynn, the N. E. corner of Terry, and the S. W. corner of Hockley counties should be located at the point where the meridian passing through the Statutory N. W. corner of Hale county intersects said parallel of latitude, and that the N. W. corner of Terry, the N. E. corner of Yoakum, the S. E. corner of Cochran, and S. W. corner of Hockley counties should be located at the point of intersection of the meridian passing through the Statutory N. W. corner of Lamb county and said parallel of latitude; that the east and west lines of said counties should be located along meridians passing through said corners as located. Since it may be advisable to provide by final judgment for the location of said lines on the ground, the judgment will be reversed and remanded with directions to the trial court to adjudge the location of the boundaries involved in accordance herewith and, if deemed advisable, have an actual survey made and incorporate the result thereof in the final judgment.

We are of opinion that no error is shown in the action of the trial court in refusing to so retax the costs as to charge the several counties with a pro rata part of the expenses of Williams in making his surveys. If under any circumstances it was the duty of the court to make the appointment, it was certainly a matter within the court's discretion. Having exercised it, subject to the express condition that the counties desiring his services should pay for same, we do not feel called upon to reverse such action. R. S. 1925, art. 1591, in so far as it provides that the court shall, if necessary, order boundary lines to be re-marked and resurveyed, has no application. Those things could not be done until the court had determined the disputed questions as to the proper location of such lines. Whether the court, under its duty, as provided in said article, to "determine where such boundary line is located," would have implied authority to appoint a surveyor and tax the expense thereof as costs, we need not determine. Whether so or not, we think the court could attach any reasonable condition to the exercise of his discretion.

Reversed and remanded with instructions.