HUNT COUNTY V. RAINS COUNTY.

No. 4400.   Decided December 8, 1926.
(288 S. W., 805).

1.—County—Boundaries—Definition by Legislature—Location by Commissioners.

An Act of the Legislature created, out of existing counties, a new county, defined its boundaries, and named commissioners to organize it and have its boundary lines surveyed and marked. These lines, plainly marked and still identifiable, by error in the survey, included in the land taken from an adjoining county territory not embraced in the lines defined by the Act. The line so marked was recognized by both counties and various public authorities, for many years, as the boundary between these counties. *Held*, that it was properly adjudged to be the true boundary line in an action between the counties to determine the same.   (Pp. 279-286).

2.—Same—Curative Act.

The establishment of the county line by the commissioners authorized so to do and its subsequent continuous recognition as the boundary line had the legal effect of constituting it as such, and as the marked, recognized and undisputed boundary at the passage of the curative Act of 1895 (Rev. Stats., 1925, Art. 1606, Rev. Stats., 1911, Art. 1400) by which it was established as the boundary. And this though its location was not in accordance with a call for distance from a determinable point in the Act (1870) creating the new county and defining its boundaries and those of the old one from which territory was to be taken.   (P. 286).

3.—Same—Constitutional Law.

The recognition by the Act of 1895 (Rev. Stats., 1925, Art. 1606; Rev. Stats., 1911, Art. 1400) of the marked, recognized and hitherto undisputed boundary line established by the commissioners was not unconstitutional as taking from Hunt County territory thereof without submission to vote of the electors of both counties as required by Art. 9, Sec. 1 of the Constitution. The Act merely gave validity and legislative approval to the exercise of authority (erroneous only by a surveyor's mistake in measurement) conferred on the commissioners marking the line. This mere irregularity did not make their action void.   (Pp. 286-288).

Questions certified from the Court of Civil Appeals for the Sixth District, in an appeal from Rockwall County.

The Supreme Court referred the question to the Commission of Appeals, Section B, for its opinion thereon, and here adopts same and directs that it be certified as the answer of the court.

*C. A. Sweeton* and *Clark & Clark,* for appellant.

The Act creating Rains County and the Act adjusting the boundary lines of Hunt County definitely "established" the line. They did this with more certainty than either the Perry Taylor survey or the Montgomery field notes. There is uncertainty

about the true location of each of these lines, but there can be none from the description set forth in the Acts themselves. Four definite, certain, established, known and existing corners are given in the description contained in the Rains County Act. Presidio County v. City Natl. Bank, 20 Texas Civ. App., 511, 44 S. W., 1069; Kimball v. Town of Rosendale, 42 Wis., 407; Sykes v. Mayor, 55 Miss., 137; Charlotte H. & N. Ry. Co. v. Wells, 260 U. S., 8; Katzenberger v. Aberdeen, 121 U. S., 172; 6 R. C. L., 321; People v. Henderson, 40 Cal., 29; Presidio County v. Jeff Davis County, 77 S. W., 278.

The law designed to settle existing boundary lines "recognized and established" at the time it was enacted in 1895, has no application to a case like this. It was never intended to apply to a case where the description of the county contained in the law authorizing its creation was certain, definite and readily ascertained when applied to objects called for and in no way conflicting with any other line. The line here in question is the true and established line, "established" by the law creating Rains County, as well as in the act to conform the boundary of Hunt County thereto.

The word "recognize" means "to admit; to acknowledge something existing before." 7 Words & Phrases, p. 6005; 34 Cyc., 573. Within the meaning of Art. 1400, Rev. Stats., the word "established" means "definitely marked and known." Stephens County v. Palo Pinto County, 155 S. W., 1006; Garvey v. Cain, 197 S. W., 769; Pecos County v. Brewster County, 250 S. W., 310. "Establish" means "settled, fixed, confirmed." Suit v. State, 30 Texas App., 322. It means to "settle or fix unalterably." Hart v. Hart, 110 S. W., 92; Endowment Rank v. Steele, 63 S. W., 1128; 3 Words & Phrases, p. 2472.

There was never any kind of legal authority for the location of the line at the point claimed by Rains County. This being true, it appears to follow, as night follows the day, that up to 1895, when Art. 1400 (now Art. 1606, R. S., 1925) was incorporated in the statutes of this State, Hunt County was the undoubted, absolute and unqualified owner of the land in controversy. The unauthorized survey of Perry Taylor could not take any part of the territory in question away from Hunt County. Acquiescence in or "recognition" of the line by Hunt County could not take from Hunt County any of its land. A county cannot be made to surrender its territory by mere fact that its officers or citizens acquiesce in an invalid, adverse claim. Marsalis v. Garrison, 27 S. W., 932

The holding of the majority that the Legislature can ratify and thereby render valid an illegal Act it cannot now constitu-

tionally authorize is, it seems to us, fundamentally unsound. The Legislature cannot ratify a former Act where "it has no present authority to authorize like proceedings."

There can be no shadow of legal claim on the part of Rains County to the land in question up to 1895. Rains County having no claim to the land, Hunt County being the undoubted owner of the property, did the Legislature undertake to and did it have the power, in definance of Subd. 3, Sec. 1, Art. 9, of the Constitution of 1876, to "detach" from Hunt County the territory in question, under the guise of ratifying the unauthorized and illegal survey of Perry Taylor? It seems clear to us that the Legislature never intended that Act to apply to such a case.

*H. D. Garrett, E. D. Foree,* and *McMahan & Dohoney,* for appellee.

The evidence shows that the boundary lines of Rains County were surveyed and established upon the ground in 1870 in pursuance of the Act of the Legislature creating said County, and the field notes returned to the General Land Office in 1872; that the line contended for by appellee and established by the verdict and judgment was actually established and marked upon the ground by said survey, and that said line was recognized by the Commissioner of the General Land Office and by Rains and Hunt Counties long prior to the enactment of Article 1400 of the Revised Statutes, and was so recognized at the time of said enactment. The court therefore did not err in submitting the case to the jury and the verdict and judgment are amply sustained by the evidence, even though the surveyor in running said lines in 1870 may have made a mistake and gone further into Hunt County than called for in the original Act establishing Rains County. Rev. Stats., Arts. 1385, 1400, 5323; Stephens County v. Palo Pinto County, 155 S. W., 1006; Hall County v. Lubbock County, 194 S. W., 678; Pecos County v. Brewster County, 250 S. W., 312.

MR. PRESIDING JUDGE POWELL delivered the opinion of the Commission of Appeals, Section B.

This cause is before the Supreme Court upon the following certificate from the Honorable Court of Civil Appeals of the Sixth District:

"I.

"Hunt County instituted this suit against Rains County to have the true boundary line between the two counties declared, located, marked and established. The line in controversy is the

west boundary of Rains and the east boundary of Hunt County.
Hunt County claimed by its petition that:

" 'For many years there has been a dispute between the plaintiff and defendant as to true location of the boundary line between said counties, the disputed line being mainly the west boundary line of Rains County and that portion of the east boundary line of Hunt County adjoining the same * * *; that the defendant claims that the northwest corner of said Rains County is located about one mile farther west and several hundred feet farther north than the real northwest corner of said county, and that the line runs thence from said point to Hooker's Mill; that the true boundary line between said counties claimed by plaintiff is as follows: Beginning at the southwest corner of Hopkins County as established by Hiram McMillan on March 4, 1861, a stake from which a P. O. marked S. W. brs. N. 88 E. 395.5 vrs., thence W. at 8 degrees and 55 minutes variation 4 miles to a stake from which a bois d'arc brs. N. 48 W. 474 vrs., this point being 638 vrs. South abt. 1173 vrs. East of the N. W. corner of the Marshall Crawford survey. Thence S. 25 vrs. W. at 6 miles to a stake on the E. bank of Cow Leach Fork of Sabine River about 30 feet from center of creek, from which an elm brs. N. 08 W. 10.8 vrs., an Ash brs. N. 86 E. 07.7, both marked X, this point being about 60 vrs. W. of the dam on slough of the old Hooker Mill and about 100 vrs. W. of the site of the old mill * * *; that the line is an old line that has been marked and has existed for many years and is substantially the true and correct line as laid out according to the Act creating Rains County, and that no other line has ever been established between said counties, and that no other line has ever been recognized by the County of Hunt, the County of Rains, or by the General Land Office of this State.' The prayer was that 'the lines herein described be declared to be the true boundary line, and, in any event, that the true boundary line be ascertained, located, marked and established.'

"The County of Rains by its answer claims that:

" 'The Act creating Rains County appointed commissioners (naming them) with full power to organize the county and to employ a competent surveyor to run the county lines; and that the commissioners proceeded with the organization of the county and employed. Perry Taylor, a competent surveyor, and that said Perry Taylor, with the assistance of the commissioners and others, surveyed and ran out the lines of Rains County as provided and directed by the Act, and actually marked and established the lines upon the grounds. * * * That the field notes of Rains County as so laid out and established were returned to the General Land Office on October 21, 1872, by J. W. Mont-

gomery, who, at the time, was the duly elected and qualified surveyor of Rains County, and are as follows (here follows description) ; that the line so established has since that time been recognized; that the lines so laid out and established in 1870, and as described in the field notes returned to the General Land Office in 1872, is the true boundary line between said counties; that there has not ever been any controversy as to the location of the boundary lines or any portion of said lines between Hunt and Rains County; that the land contiguous to said line,' etc., has been recognized as the boundary line. The prayer was that 'plaintiff take nothing by reason of its suit; that the court enter its decree declaring the boundary line established in 1870 to be the true boundary line between said two counties.'

"Rains County was created by the Act of 1870, p. 2.   Section 1 of the Act reads:

" 'That a new county, to be called Rains County, is hereby established out of the following portions of Wood, Hunt, Hopkins and Van Zandt Counties, bounded as follows, viz.:   Beginning on the north bank of Sabine River, at Collins Ferry, known as Mud Bridge, thence in a northern direction through a tract of land known as the Jim Bridges tract, to the McMillan boundary line between Wood and Hopkins Counties, thence west with said line four miles into Hunt County, thence about southwest in a direct line to Hooker's Mill on the east branch of Sabine River, thence down Sabine River with its meanderings to the place of beginning.'

"At the same session of the Legislature the boundaries of Hopkins and Hunt Counties were revised to be in conformity with the field notes of Rains County.   Acts 1870, pp. 2 and 42. As revised the southwest corner of Hopkins County was to be on 'the north line of Rains County' at the west end of 'the McMillan line.'   As to Hunt County, the second, third and fourth calls were:

" 'Thence south to the north line of Rains County; thence with said line west four miles; thence in a southwestern direction to Hooker's Mill on the East branch of Sabine River.'

"The lines bringing about the suit are the lines defined in the Acts, pertaining to Hunt and Rains Counties, reading:

" 'Thence with said line (referring to the McMillan line at the west end of which is fixed the S. W. corner of Hopkins County) West four miles into Hunt County; thence about southwest in a direct line to Hooker's Mill on the East branch of Sabine River.'

"The issues submitted to the jury, and the answers made thereto, are as follows:

" 'Question 1.   Prior to the year 1895 had the east boundary

line of Hunt County, adjoining the west boundary line of Rains County, been surveyed and marked? Answer: Yes.

" 'Question 2. Was said surveying and marking made on the line as alleged by plaintiff or on the line as alleged by the defendant? Answer: Defendant.

" 'Question 3. Prior to the year 1895 had there been any dispute or uncertainty as to location of the east boundary line of Hunt County, adjoining the west boundary line of Rains County. Answer: No.

" 'Question 4. Prior to the year 1895 had the said boundary line between the two counties been recognized as a definite line' by the officials of the two counties? Answer: Yes.'

"The evidence supports the verdict, and their findings are adopted. Upon this verdict the court entered judgment establishing the boundary line in question, as follows: Beginning at a 'stake on the north side of Sabine River near what is known as the old Hooker Mill;' thence north 15 degrees east to a point in the Wm. P. Buzan survey where a line so run will intersect a line running west from the southwest corner of Hopkins County at the west end of a line known as 'the McMillan line.' The evidence is referred to in the opinion.

"II.

"The commissioners appointed by the Act of 1870 employed, as they were authorized to do, Perry Taylor, a competent surveyor, to run out the boundary lines of Rains County as defined by the Act. In June, 1870, after the Act took effect on June 9, 1870, the surveyor, with the assistance of the commissioners and others, actually surveyed and established on the ground the lines. The markings in respect to the lines, especially the one in controversy, are definite and known objects existing and located on the ground. In fact, there is no dispute about the true location of these objects, and their locality. As to the line in controversy, the commissioners ran the line from the west end of the McMillan line west to a point in the 'Wm. P. Buzan survey' and thence southwest to Hooker's Mill on the east branch of Sabine River. The McMillan 'west end' is conclusively shown to be on the east line of Hunt County and at the southwest corner of Hopkins County. The postoak tree called for at this point by the McMillan survey is there now, and identified by those competent to testify thereto. It is described as a 'postoak marked S. W. and bears N. 88 E. 395.5 vrs.,' meaning from the west end of the McMillan line and the southwest corner of Hopkins County. The 'Wm. P. Buzan Survey' then existing, and now, is identified and located by those competent to know. 'Hooker's

Mill,' on the east branch of Sabine River, is clearly identified and located on the ground. It is the S. W. corner of Rains County, and is an object called for in the Act creating the county. The point established in the 'Wm. P. Buzan Survey' as marked by the commissioners, as the west end of the third call, and as the northwest corner of Rains County, as now develops, actually measures on the ground 'into Hunt County,' as then existing, more than 'four miles' from the west end of the McMillan line or the southwest corner of Hopkins County. It is at least, according to evidence, 4.94 miles distant. The line is extended nearly a mile west beyond the call for distance designated in the Act of 1870. Running the line from the 'Buzan Survey' southwest to 'Hooker's Mill' would include a wedge-shaped strip of land that would not be within the boundaries defined in the Act creating the county. The lines, and the one in controversy especially, run out and established on the ground by the commissioners in June, 1870, have been 'recognized' and treated as the true boundary lines from that date up to a time just before the institution of this suit in 1923. No proceeding leading to a re-location of the line was had by the commissioners court of either of the counties from the time it was established at a point in the Wm. P. Buzan survey in 1870 until this suit was instituted. The commissioners court of each of the counties officially acted in reference to the line in establishing justice precincts, commissioners' and voting precincts and school districts, and in laying out roads. Each county affected, though separately, exercised jurisdiction up to the full limits of the line. Votes cast by the residents along that line were returned and counted by the officers. Jurors were selected with reference to the line. Taxes were rendered and assessed with reference to the line, and the commissioners court approved the tax rolls. Deeds to land were registered and schools were located with reference to the line. The public, too, recognized the line as the boundary line of the counties. The map of Rains County originally made in the General Land Office in 1873 by the Commissioner of the State, and that has been in use in that office from that date to the present time, shows the northwest corner of Rains County to begin in the 'Wm. P. Buzan Survey,' thence east to the southwest corner of Hopkins County, and on to the northeast corner of Rains County. The abstract of land titles authorized by law and published by the General Land Office shows portions of the surveys through which the line passes to be in Rains County, and the other portions of those surveys to be in Hunt County.

"III.

"Question 1.   Did this court err in declaring to be the true boundary line, and in directing it to be resurveyed and remarked as such, the boundary line as heretofore established by the commissioners in June, 1870, and from that date to this suit in 1923 recognized by the county officials of both the counties affected as the true boundary line, beginning at the west end of the McMillan line and running west to the 'Wm. P. Buzan Survey,' and thence southwesterly to Hooker's Mill on the east branch of Sabine River?

"The trial court, in keeping with the facts, determined that the line thus established by the commissioners in 1870 and recognized thereafter was the boundary line between the two counties, and directed it to be relocated and remarked as such. This court in a majority opinion affirmed the trial court's judgment.   All the members of the court cannot agree upon the affirmance of the judgment, and dissent exists.

"Question 2.   Did the establishment of the line in June, 1870, by the commissioners, at the place done, as the west line of Rains County and the east line of Hunt County, and the subsequent continuous recognition thereof as the boundary line, have the legal effect of constituting such line, although not in accordance with the call for distance as designated in the Acts creating Rains County and defining the boundaries of Hunt County, the legal boundary line of such counties, in view of Art. 1400, Revised Statutes, reading:

" 'The county boundaries of the counties in this State as now recognized and established are adopted as the true boundaries of such counties, and the Acts creating such counties and defining the boundaries are continued in force?'

"Question 3.   Can the one county be precluded from asserting in a suit against the other a different boundary line from the one established by the commissioners in June, 1870, and thereafter recognized as the true boundary line up to 1923, either upon the doctrine of estoppel or under the terms of Art. 1385, reading:

" 'Provided, that if it be found in any such case that the boundary line in question has been heretofore established under the law then in force, the same shall be declared to be the true line and shall be resurveyed and established as such'?"

We think the trial court and a majority of the Court of Civil Appeals entered the correct judgment in this cause.   The opinions of the majority and minority of the Court of Civil Appeals will doubtless be published later.   We see no reason to enter into any lengthy discussion of the issues involved in the questions certified.

Rains County was created by special legislative Act in 1870. Said Act made provision for its organization and for ascertaining, surveying and marking the boundaries *on the ground*. As stated by the Court of Civil Appeals:

"By the Act five commissioners named herein were expressly given 'full powers to organize said county, to employ a competent surveyor to run the lines of said county, and, as early as practicable, to ascertain the center of said county,' etc.; 'and to divide the county into five precincts,' etc. The running out on the ground of 'the lines of said county' and the partitioning of the territory into precincts are necessary steps in the process of organization of a new county. And 'the lines of said county' enclosed the particular territory set apart to the new county out of the territory of the original counties. The proceedings of the commissioners in establishing the boundaries would not be wholly ex parte on the part of the new county of Rains. In so executing the command of the Legislature the commissioners named in the Act became and were the agents of the Legislature and not of the new county or any of the original counties. The consent neither of Hunt County nor of any of the original counties was necessary in order for the commissioners to run out and mark on the ground 'the lines of said county' defined by the Act, as directed by the Legislature. Hence the acts of the commissioners, being under authority of law, in legal effect would be binding equally on all the counties affected as well as on the public generally, unless in running out the boundaries defined in the Act they failed to place the lines on the ground in a position 'sufficiently special and well ascertained'."

The lines were run out on the ground and the corners definitely marked and identified. The lines so surveyed were recognized by each county interested from 1870 to 1923. As shown by the facts in this record, no attempt within any reasonable time was made by Hunt County to set aside the survey as made on the ground. If Hunt County had felt that the lines as surveyed on the ground were not "sufficiently special and well ascertained," she could have had resort to the statutory method in such cases provided. In this connection, we quote again from the Court of Civil Appeals:

"And under the general statutory law in force it was only in case the method of surveying on the ground by the commissioners was such as not to place the line or lines on the ground, in the first instance, in a position 'sufficiently special and well ascertained,' that the county or counties interested could resort to the general statutory method of having the true line run out again and marked anew on the ground by joint surveys made

by surveyors respectively representing the counties. Article 1057, P. D."

The Legislature, in 1870, had the absolute right to fix or change county boundaries. This is conceded. Having provided for a laying out of the lines *on the ground,* and such lines having been *recognized* for more than fifty years by the counties involved as well as by the State of Texas, it must be held that the lines established by such survey were the true boundary lines between the counties, even though an error was made in one call. If a divisional line between the land of two private parties had been fixed on the ground by a surveyor appointed by the parties interested for that purpose, and his line as surveyed had been recognized by the parties for fifty years, it would be held that it was, according to the very intention of the parties, the true line from the beginning. We think no different rule should apply as between counties.

Therefore, we recommend that the first question certified be answered in the negative.

It is probably unnecessary, in view of aforesaid answer, to recommend an answer to either of the other questions certified. We shall not recommend any answer to the third one.

The second question certified refers to the curative Act of 1895, known as Art. 1400 of the Revised Statutes, and quotes from said article. That such article, if *constitutional,* corrects the irregularity in marking the original line in 1870 between these two counties is conceded by all the judges of the Court of Civil Appeals. But, Justice Hodges thinks such Act is unconstitutional, because it, in effect, applied to the case at bar, changes the boundaries of a county and detaches a part of its territory without the consent of such county. In that connection, he quotes the following:

"No part of any existing county shall be detached from it and attached to another existing county until the proposition for such change shall have been submitted in such manner as may be provided by law to a vote of the electors of both counties, and shall have received a majority of those voting on the question in each." See Art. 9, Sec. 1, Constitution of the State of Texas, 1876.

In its opinion on rehearing, the majority of the Court of Civil Appeals treats this matter as follows:

"Necessarily any legal objection, as urged, to the application of the article to the facts must rest, we think, upon the ground alone that the act of the commissioners in establishing the lines was of absolute invalidity, and not an act imperfectly done under authority. For if the act of the commissioners in

establishing the line, as done, was merely an irregularity or imperfectness in executing the previous legislative authority to lay out 'the lines of said county,' then, in that case, the application of the curative statute would not be of the same import as conferring original authority upon the commissioners, never granted in the first instance. It is only in case the act of the commissioners could be said to be of absolute invalidity that the application of the curative statute, although relating to the time of doing the act, would be of the same import as conferring original authority upon the commissioner, having origin at the time of the passage of the curative law. In the latter case only would the limitation upon the present power of the Legislature to change county lines be applicable. Sykes v. Mayor and Aldermen of Columbus, 55 Miss., 115; Swartz v. Borough of Carlisle, 85 Atl., 847; Katzenberger v. City of Aberdeen, 121 U. S., 172, 30 L. Ed., 911; see 15 C. J., Sec. 28, p. 405. As determined in the original opinion, the article would be applicable to the present case and would not be subject to the constitutional objection, 'since the act of the commissioners in fixing the particular line on the ground, as done, was a mere irregularity in executing the powers conferred, and not of absolute invalidity, as independent of any legislative authority to lay out 'the lines of said county.' The commissioners appointed in 1870 had express legislative authority 'to divide the county into five precincts' and to run out on the ground 'the lines of said county.' In so executing the command of the Legislature the commissioners actually surveyed out the boundary lines on the ground and established them, but fixed the corner of the third call in the 'Wm. P. Buzan survey,' actually measuring, as later developed, '4.94 miles,' instead of 'four miles,' west of the S. W. corner of Hopkins County. This particular error of distance was occasioned, as we must assume, merely by mismeasurement on the ground. A mistake did not occur in the first and second calls, nor in the fourth call except so far as the consequence of beginning that call in the 'Wm. P. Buzan Survey.' Therefore, although the location of the corner of the third call at that point was erroneous in fact, yet it was purely the result of measurement on the ground, imperfectly done under authority to establish on the ground 'the lines of said county.' The lines so 'established' in 1870 were 'recognized' as the county boundaries for years afterward, not as established independent of any legislative authority, but as established in pursuance of legislative authority conferred upon the commissioners to do so in the manner done. According to the terms of Article 1400, the 'Act'

creating the county in the first instance is 'continued in force' without re-defining the boundaries."

We think this Act, as applied to the case at bar, is constitutional.   We agree with the majority of the Court of Civil Appeals in this conclusion.   The most that can be said in favor of Hunt County is that an error in surveying was made.   An irregularity in one detail in exercising the general authority under the Act creating Rains County had occurred.   Such irregularity was cured by the Act in question, and that Act but gave legislative approval to the acquiescence and recognition of the parties themselves of the lines as established in 1870.   It did not detach any land from Hunt County which belonged to it.   It merely gave final validity to the attempted exercise of authority conferred in 1870, and which attempted exercise thereof, even though erroneous in one respect, had been recognized by Hunt County from 1870 to 1895, when the curative Act was passed.

We recommend that the second question certified be answered in the affirmative.

The opinion of the Commission of Appeals answering certified questions is adopted and ordered certified to the Court of Civil Appeals.

*C. M. Cureton,* Chief Justice.