CITY OF MASON V. WEST TEXAS UTILITIES COMPANY.

No. A-2752. Decided February 7, 1951.
Rehearing overruled April 4, 1951.
(237 S. W., 2d Series, 273.)

*R. E. Lee,* of Mason, for petitioner.

The Court of Civil Appeals erred in holding that the ordinance of the City of Mason, ousting the West Texas Utility Co., was declared inoperative by H.B. 393, of the 51st Legislature, Article 1436a, Vernon's Statutes, in the absence of a clear statement evidencing such a legal purpose; in refusing to construe said act a state grant or privilege, strictly against the grantee; and in construing said act as having a restrospective application in the absence of language showing a clear intent of the Legislature to make the act apply to rights existing and vested at and prior to its passage. State of Texas v. Humble Oil & Ref. Co.,

141 Texas 40, 169 S.W. 2d 707; Gulf Ins. Co. v. James, 143 Texas 424, 185 S.W. 2d 966; State v. J. M. Huber Corp., 193 S.W. 2d 882.

*Scott Snodgrass,* of San Angelo, *Roscoe Runge,* of Mason, *Wagstaff, Harwell, Wagstaff & Alvis* and *E. L. Harwell,* all of Abilene, *Looney, Clark & Moorhead, Everett L. Looney* and *R. Dean Moorhead,* all of Austin, for respondent.

The construction given H.B. 393 by the Court of Civil Appeals is correct and in no way impaired or affected any vested right of petitioner or its bond holders. City of Jasper v. Gulf States Utilities Co., 144 Texas 184, 189 2d 693; S.W. Tel. & Tel. Co. v. City of Dallas, 174 S.W. 636—error refused; 30 Tex. Jur., p. 97.

MR. JUSTICE SHARP, delivered the opinion of the Court.

The City of Mason filed this suit against the West Texas Utilities Company for a mandatory injunction to compel compliance with an ordinance of the city requiring the West Texas Utilities Company to remove all poles, wires, transformers, conduits, and other property used by it in, upon, under, across, and along the public streets and alleys within the City of Mason. The case was tried before the court without a jury, and the trial court entered judgment in favor of the City of Mason. An appeal was taken to the Court of Civil Appeals, and that court reversed the judgment of the trial court and rendered judgment that the West Texas Utilities Company had the right to maintain its poles and lines in the City of Mason, without the city's consent, for a period of ten years after November 13, 1945, the date of the city's incorporation. 229 S. W. 2d 404.

In 1925 the Commissioner's Court of Mason County granted the respondent a franchise to operate and maintain its lines for conducting electric current and supplying light, heat, and power to cities and towns in Mason County, and gave it an easement over and along public county roads and highways, and upon and across streets, alleys, sidewalks, and public grounds of unincorporated towns. Such franchise was to run for a period of fifty years from October 13, 1925. Respondent accepted the terms of the franchise, and built its lines into the City of Mason in 1926. Mason was incorporated November 13, 1945, and in 1948 constructed its own electric power system.

This case involves the construction of House Bill 393, Chapter 228, Acts 51st Legislature, 1949, now Article 1436a, Vernon's Annotated Civil Statutes.

It is of primary importance in construing a statute to ascertain the purpose for which the statute was enacted. Unquestionably this act was passed to give relief to utility companies from the consequences resulting from the two recent decisions of this Court in State ex rel. City of Jasper v. Gulf States Utilities Company, 144 Texas 184, 189 S. W. 2d 693, and Incorporated Town of Hempstead v. Gulf States Utilities Company, 146 Texas 250, 206 S. W. 2d 227. Prior to those decisions it was the opinion of many that the commissioners' courts of counties in this state had the authority to permit the use of the streets and alleys of unincorporated towns by utility companies in the conduct of their business. It is undisputed that some utility companies, including respondent, acting under this belief, and in good faith, invested considerable sums of money in unincorported towns, and that the two decisions mentioned above caused them great losses in their investments. The history of the enactment of the statute under consideration clearly shows that the very purpose of its enactment was to afford relief to such utility companies for the losses resulting from the effect of the two decisions cited above.

It is agreed that under the law as decided in the Jasper and Hempstead cases, supra, the City of Mason had the right to order respondent to remove its poles and lines from its streets and alleys, prior to the enactment of Article 1436a. It is also agreed that as to towns incorporated after the enactment of Article 1436a, the utility companies affected would have ten years after the date of incorporation of any such town within which to operate their business therein without the consent of such town. The parties disagree over the question whether Article 1436a should be construed to confer the right on utility companies to maintain their previously built lines in cities incorporated before the enactment of Article 1436a, without the consent of such cities, for a period of ten years from and after the date of incorporation of any such city.

Two bills were introduced, one in the Senate and the other in the House. The House and the Senate were unable to agree on a bill. On account of the disagreement, the bill was referred to a free conference committee, where the differences were adjusted, and the bill was finally passed by both branches of the Legislature, and was approved by the Governor. The record shows that the bill had been radically amended in several particulars before its final passage, and that it undertakes to control several classes of utility companies; and it is obvious that

the language used in expressing the intention of the Legislature is not entirely clear.

The record shows that at the time the Legislature was considering Senate Bill No. 205 and House Bill No. 393, the Governor addressed a special message to the Legislature on this very question, and submitted the two bills as emergency matters for its consideration. In that message the attention of the Legislature was called to the importance of the question and that immediate relief should be given companies affected by the two decisions mentioned above. We quote from the message as follows:

"Austin, Texas, March 9, 1949.

"To the Members of the 51st Legislature:

"The continued expansion of facilities for the distribution of electric light and power in rural areas of Texas is of great importance. All of us know that many electric lines have been built along the right-of-way of state highways and county roads. Many thousands of miles of lines have been so constructed and built by rural electric cooperatives and other utilities engaged in the distribution of electric power. *These lines were built in good faith under franchises granted by the various Commissioners' Courts of Texas, and they provide the means of getting electric light and power to many small towns and rural communities.*

"*In what are known as the Hempstead and Jasper cases, the Supreme Court of Texas has held that the Commissioners' Courts had no authority to grant such franchises. The result of this decision is that all such lines constructed under county franchises are now illegally on the right-of-way of such roads and highways. The expense of moving them would be prohibitive and in many rural areas and unincorporated towns the people cannot enjoy the benefits of electric service unless the lines are built along the edge of the right-of-way of highways and county roads.*" (Emphasis ours.)

This act deals with two classes of utility companies, and the restrictions and privileges expressed therein are not applicable to both alike. That part of the act which deals with the rights of respondent, and whose rights are similar to those of the Gulf States Utilities Company in the two cases cited above, is involved in this suit.

In order to show the intention of the Legislature in enacting this law, we copy from the statute the following:

The caption of the act reads as follows: "An Act to facilitate and encourage the distribution of electric energy to the inhabitants of the small towns, villages and rural areas of the State of Texas by providing that lines for the transmission and transportation of electric energy may be constructed, erected and maintained on the right-of-way of roads and highways outside the corporate limits of cities and towns and providing that such lines may be constructed, erected and maintained within the corporate limits of a city or town with the consent and under the direction of its governing body; *providing that where such lines are built into an unincorporated town, which thereafter becomes an incorporated town, the corporation owning such lines shall have the right to extend, operate and maintain its lines in said town for a period of ten years after the date of such incorporation;* providing adequate standards of construction for the safety of the public; repealing all laws and parts of laws in conflict herewith; containing the severability clause; and declaring an emergency." (Emphasis ours.)

Section 1, among others, contains the following provision:

"In the event a State highway or county road on which lines have been built passes through or into an unincorporated city or town, which thereafter becomes an incorporated city or town, *the corporation owning such lines shall continue to have the right to build, maintain and operate its lines along, across, upon and over the roads and streets within the corporate limits of such city or town for a period of ten (10) years from and after the date of such incorporation, but thereafter only with the consent of the governing body of such city or town,* but this provision shall not be construed as prohibiting such city or town from levying taxes and such special charges for the use of the streets as are authorized by Article 7060, Revised Statutes of the State of Texas; and the governing body of such city or town may require any such corporation, at its own expense, to relocate its poles and lines so as to permit the widening or straightening of streets, by giving to such corporation thirty (30) days notice and specifying the new location for such poles and lines along the right-of-way of such street or streets." (Emphasis ours.)

Section 4 reads: "The fact that since the beginning of the electric power and light business in this State the distribution of electric energy to areas outside of the limits of incorporated cities has been based on the legal concept that the Commissioners Courts of this State had the authority to grant franchises for the use of the roads and highways; *and the further fact that*

*the Supreme Court has held that Commissioners Courts have no such authority; and the fact that, under such decision, there is no agency authorized to permit electric lines to be built along the edge of the right-of-way of highways and public roads, or to authorize the maintenance and operation of lines that have been so built under county franchises, thus making it extremely difficult, if not impossible in many cases, to finance the extension of existing lines, or to build new lines,* * * * creates an emergency and an imperative public necessity * * *, and it is so enacted." (Emphasis ours.)

The foregoing provisions of the act apply to corporations like respondent and the one involved in the Jasper and Hempstead cases.

Within recent years certain home rule cities have been permitted to own, maintain, and operate rural electrification systems. Some of those systems supply electric energy and lights to incorporated and unincorporated cities, school districts, and large rural areas. Some of the lines pass through towns and school districts, and the taxing authorities of the towns and school districts undertook to levy taxes on them. The owners of the corporations claimed that such property owned, maintained, and operated by them was held for public purposes, and was exempt from taxation. This Court rendered an opinion on January 17, 1945, in the case of A. & M. Consolidated Independent School District v. City of Bryan, 143 Texas 348, 184 S. W. 2d 914, and held that the electric lines owned by a city outside of its limits and within an independent school district were exempt from ad valorem taxation by such district. This decision raised an important question, and evidently the Legislature intended by the enactment of certain provisions of the act to protect a town or city through which another city wanted to extend its electrical lines, and place some restrictions thereon.

The bill was amended in many respects, which throws considerable light on what the Legislature wanted to accomplish. The caption of the act was also amended, so as to read as follows: "* * * *providing that where such lines are built into an unincorported town, which thereafter becomes an incorporated town, the corporation owning such lines shall have the right to extend, operate and maintain its lines in said town for a period of ten years after the date of such incorporation;* * * *." (Emphasis ours.)

The following provision, as well as others, was deleted by the

free conference committee from Section 1 of the act under consideration: "Nothing herein shall be construed as granting the right to *such corporation* to maintain existing lines in any area, which is included within the corporate limits of a city or town prior to the effective date of this Act, without the consent of the governing body of such city or town." (Emphasis ours.) The restriction contained in Section 1 applicable to "such corportion" was removed and placed in Section 1a, and applied to "municipal corporation." It is very significant that this restriction was removed from respondent and like corporations and placed upon municipal corporations. That the Legislature intended to deal more liberally with companies like respondent, than with municipal corporations owning and operating lines in towns covered by the statute, is plainly shown by the statute as finally enacted.

The following is quoted from Section 1a of the act: "Any incorporated city or town in this State which owns and operates an electric generating plant or operates transmission lines and/or distribution system or systems shall have the right to erect, construct, maintain and operate lines over, under, across, upon and along any state highway or county road in this State, except within the limits of another incorporated city or town; and to maintain and operate existing lines located on such highways and county roads, and to erect, maintain and operate lines over, across and along the streets, alleys and other public propety in any other incorporated city or town in this State with the acquiescence or consent and under the regulations of the governing body of such city or town. * * * In the event a State highway or county road on which lines have been built passes through or into an unincorporated city or town, which thereafter becomes an incorporated city or town, the *municipal corporation* owning such lines shall continue to have the right to build, maintain and operate its lines along, across, upon and over the roads and streets within the corporate limits of such city or town for a period of ten (10) years from and after the date of such incorporation, but thereafter only with the consent of the governing body of such city or town; and the governing body of such city or town may require the municipal corporation owning such lines, at its own expense, to relocate its poles and lines so as to permit the widening or straightening of streets, by giving to the *municipal corporation* owning such lines thirty (30) days notice and specifying the new location for such poles and lines along the right-of-way of such street or streets." (Emphasis ours.)

It is also very significant that Section 1a of the body of the act contains the provision: *"Nothing herein shall be construed as granting the right of such municipal corporation to maintain existing lines in any area, which is included within the corporate limits of another city or town prior to the effective date of this act, without the consent of the governing body of such other city or town."* (Emphasis ours.) The foregoing provisions of the act were passed to apply to companies owned by municipal corporations and to meet the situation created by the decision of this Court in A. & M. Consolidated Independent School District v. City of Bryan, 143 Texas 348, 184 S. W. 2d 914.

■ The fundamental rule controlling the construction of a statute is to ascertain the intention of the Legislature expressed therein. That intention should be ascertained from the entire act, and not from isolated portions thereof. This Court has repeatedly held that the intention of the Legislature in enacting a law is the law itself; and hence the aim and object of construction is to ascertain and enforce the legislative intent, and not to defeat, nullify, or thwart it. 39 Tex. Jur., pp. 166, 167, sec. 90; 50 Amer. Jur., p. 200, sec. 223; 59 C. J., p. 948, sec. 568. It is settled that the intention of the Legislature controls the language used in an act, and in construing such act the court is not necessarily confined to the literal meaning of the words used therein, and the intent rather than the strict letter of the act will control. 39 Tex. Jur., pp. 180, 181, sec. 95; 50 Amer. Jur., p. 232, sec. 240; 59 C. J., p. 964, sec. 593.

This Court, in Gilmore v. Waples, 108 Texas 167, 188 S. W. 1037, said: "Courts will not follow the letter of a statute when it leads away from the true intent and purpose of the Legislature and to conclusions inconsistent with the general purpose of the Act."

In the recent case of Texas & N. O. Ry. Co. v. Railroad Commission of Texas, 145 Texas 541, 200 S. W. 2d 626, this Court, in construing the legislative act involved in that case, said that "whenever the legislative purpose is ascertained, the significance of words used may be restricted or enlarged in order to effectuate that purpose and to give the act the meaning which the lawmakers manifestly intended."

This Court, in Brazos River Conservation and Reclamation District et al. v. E. P. Costello et al., 135 Texas 307, 143 S. W. 2d 577, 130 A. L. R. 1200, said: "The dominant rule controlling the construction of a statute is to ascertain the intention of the

Legislature expressed therein. An Act should be given a fair and sensible construction, in order to carry out the purposes for which it was enacted, and not be construed in such manner as to nullify or defeat its purposes."

■ The City of Mason is not a home rule city, and whatever right it has to control its streets is derived from the Legislature. The State, acting through the Legislature, has absolute control over the streets of municipal corporations, and, subject to constitutional provisions, the Legislature may enlarge, contract, or abrogate, at its pleasure, the scope of control exercised by such a city over its streets. Payne v. Massey, 145 Texas 237, 196 S. W. 2d 493; 39 Tex. Jur., p. 595, sec. 57; 9 Tex. Jur., Ten Year Supp., p. 10, sec. 57; 25 Amer. Jur., p. 545, sec. 254; 30 Tex. Jur., p. 97, sec. 46; 7 Tex. Jur., Ten Year Supp., p. 389, sec. 46; 37 Amer. Jur., p. 720, sec. 111.

■ Unquestionably the Legislature has the authority to limit the power of cities to control their streets as delegated by Article 1016. That was expressly done by the enactment of Articles 1416 and 1435, and also by the enactment of Article 1436a. Under the law the City of Mason had the right to construct its own electric system and operate it in competition with that of respondent. City of Vernon et al. v. Montgomery, 265 S. W. 188, writ refused; Nalle v. City of Austin, 85 Texas 520, 22 S. W. 668, Id. 960. But the City of Mason is not authorized to create a monopoly by its own acts, for this is forbidden by Section 26 of Article I of the Constitution. City of Brenham v. Brenham Water Co., 67 Texas 542, 4 S. W. 143; Hartford Fire Ins. Co. v. City of Houston, 102 Texas 317, 116 S. W. 36; City of Vernon et al. v. Montgomery, supra. Article 1436a in no way impairs the right of the bondholders to enforce their rights or claims against the system installed by the City of Mason. Those who invested in the system did so with the knowledge that the City of Mason could not create a monopoly, and that the Legislature, if it saw fit, was authorized to pass laws regulating the use of its streets which would be in conflict with the ordinances of the city. Therefore they ran that risk when they made their investment.

■ Article 1436a was passed for the purpose of curing, or remedying to a certain extent, the conditions caused by the two decisions mentioned above, and also to meet the conditions created by the decision in A. & M. Consolidated Independent School District v. City of Bryan, 143 Texas 348, 184 S. W. 2d 914. The message of the Governor and the act itself refer to the results

caused by the two decisions above mentioned and the losses sustained by the companies as a consequence thereof. The clear purpose for the enactment of the law was to permit the company involved in this case and other companies similarly situated to operate their lines in such unincorporated towns for a period of ten years from and after the dates of their incorporation; this privilege materially reducing the losses to be sustained.

It would be a grave injustice to ascribe to the Legislature in the passage of this act an intention not to give the companies for whose benefit it was passed some relief. One of the purposes of the act was to cure or remedy a situation created by the two decisions holding that the commissioners' court of a county did not have the power to permit companies to use the streets and alleys of unincorporated towns in the conduct of their business. The Legislature in the exercise of its power gave the companies whose lines extended through unincorporated towns, which later became incorporated towns, *"the right to build, maintain and operate its lines along, across, upon and over the roads and streets within the corporate limits of such city or town for a period of (10) years from and after the date of such incorporation, but thereafter only with the consent of the governing body of such city or town."* (Emphasis ours.)

It is quite evident that the statute was enacted for the specific purpose of giving some relief to those companies which had in good faith constructed, maintained, and operated their lines in unincorporated towns under orders of the commissioners' courts of the counties, and to give them the right to continue such operation of their lines in such towns for a period of ten years from and after the date of the incorporation of such towns.

■ The enactment of remedial or curative statutes constitutes a valid exercise of legislative power. It cannot be questioned that at the time respondent built its lines in the City of Mason, the Legislature had the authority to authorize it to do so. The Legislature may ratify anything it could have authorized in the first instance. Miller et al. v. State et al., 155 S. W. 2d 1012, writ refused; Hunt v. Atkinson, Tex. Com. of App., 18 S. W. 2d 594; Hunt County v. Raines County, 7 S. W. 2d 648; 39 Tex. Jur., p. 41, sec. 19; 8 Tex. Jur., Ten Year Supp., p. 794, 795, sec. 19.

The Legislature has passed many curative, remedial, and

validating statutes. For example, it has passed acts validating bonds, city charters, and county boundaries. Also, the Legislature has passed many acts confirming the rights of purchasers of public lands, and validating the organization of drainage, improvement, and school districts. 39 Tex. Jur., p. 42, sec. 19; 8 Tex. Jur., Ten Year Supp., p. 794, sec. 19. The history of this character of legislation plainly shows the policy of the Legislature in dealing with situations like the one under consideration, and why it enacted Article 1436a.

■ If a statute is curative or remedial in its nature, the rule is generally applied that it be given the most comprehensive and liberal construction possible. It certainly should not be given a narrow, technical construction which would defeat the very purpose for which the statute was enacted. 39 Tex. Jur., pp. 273, 274, sec. 145; 59 C. J., p. 1106; sec. 657; 50 Amer. Jur., p. 415, sec. 392, and the cases cited from the many jurisdictions in support of the rule.

The Court of Civil Appeals correctly held that respondent had the authority under Article 1436a to maintain and operate its lines within the city limits of Mason for ten years after the incorporation of the city, and the judgment of the Court of Civil Appeals is affirmed.

Opinion delivered February 7, 1951.

MR. JUSTICE GRIFFIN, joined by Justices Calvert and Smith and Chief Justice Hickman, dissenting.

I find myself unable to agree with the majority opinion herein, and respectfully dissent for the following reasons:

On February 16, 1949, there was introduced in the Legislature House Bill 393. The caption of this bill originally read as follows:

"An Act to facilitate and encourage the distribution of electric energy to the inhabitants of the small towns, villages and rural areas of the State of Texas by providing that lines for the transmission and transportation of electric energy may be constructed, erected and maintained on the right-of-way of roads and highways outside the corporate limits of cities and towns and providing that such lines may be constructed, erected and maintained within the corporate limits of a city or town with the consent and under the direction of its governing body; and providing adequate standards of construction for the safety of

the public; repealing all laws and parts of laws in conflict herewith; containing the severability clause; and declaring an emergency."

Section 1 of the bill provided that corporations engaged in the distribution of electric energy "shall have" the right to construct their lines on, across, and along State highways and county roads, "except within the limits of an incorporated city or town," to maintain and operate existing lines located on such highways and county roads, and to erect and maintain lines on the streets and alleys of incorporated cities or towns "with the consent and under the direction of the governing body of such city or town." After providing for safety regulations for the construction of such lines, and for their relocation under specified conditions, the bill contained the following provisions, which both parties have agreed to be crucial in this case:

"In the event a State highway or county road on which lines have been built passes through an unincorporated city or town, which thereafter becomes an incorporated city or town, the corporation owning such lines shall continue to have the right to build, maintain and operate its lines along, across, upon and over the roads and streets within the corporate limits of such city or town for a period of ten years from and after the date of such incorporation, but thereafter only with the consent of the governing body of such city or town * * *."

Paragraph 1 of the bill closed with the following sentence:

"Nothing herein shall be construed as granting the right to such corporation to maintain existing lines in any area, which is included within the corporate limits of a city or town prior to the effective date of this Act, without the consent of the governing body of such city or town."

Sections 2 and 3 of the bill are not important for the purposes of this case. Section 4 contains an emergency clause, which reads in part as follows:

"Sec. 4. The fact that since the beginning of the electric power and light business in this state the distribution of electric energy to areas outside of the limits of incorporated cities has been based on the legal concept that the Commissioners' Courts of this State had the authority to grant franchises for the use of the roads and highways; and the further fact that the Supreme Court has held that Commissioners' Courts have no such authority; and the fact that, under such decision there is no

agency authorized to permit electric lines to be built along the edge of the right-of-way of highways and public roads, or to authorize the maintenance and operation of lines that have been so built under County franchises, thus making it extremely difficult, if not impossible in many cases, to finance the extension of existing lines, or to build new lines; and the fact that there is now no adequate standard of construction for the safety of the public in the rural areas and small towns, and the fact that the public demands the expansion of electric service in the rural areas of the State creates an emergency and an imperative public necessity that the Constitutional Rule requiring bills to be read on three several days in each House be suspended, * * *."

On March 9, 1949, the Governor sent to the Legislature a message submitting House Bill 393 as an emergency matter. His message is copied in full in a footnote to the opinion of the Court of Civil Appeals (229 S.W. 2d at p. 406) and it therefore need not be copied here. The message refers to the Hempstead and Jasper cases, but makes no mention of the problem of the extension or maintenance of utility lines in incorporated cities or towns.

House Bill 393 went through a process of amendment during its passage through the Legislature. In the House of Representatives, there was added to Section 1 the following clause:

"* * * provided, however, that if such corporation has heretofore built its distribution lines and facilities in an unincorporated city or town in good faith and under the provisions of a franchise agreement theretofore entered into with the Commissioners Court, and if such corporation is operating such distribution system in such city or town at the time this Act becomes effective, it shall have the right upon the payment of taxes and any special charges levied by the city or town under Article 7060 to continue to maintain and operate such distribution system and necessary facilities incident thereto until the the expiration date contained in franchise agreement by the Commissioners Court, or ten (10) years, whichever is less, notwithstanding the fact that such city or town may have become incorporated before the effective date of this Act."

This amendment was known as "The James Amendment."

This clause was stricken in the Senate and the Bill was referred to a conference committee. The bill as reported out

of the conference committee and as finally passed by both houses of the Legislature contained neither the original sentence, stating expressly that the act should not be construed as granting the right to a utility company to maintain existing lines within the limits of a city or town incorporated before the passage of the act without the consent of such city or town, nor the House amendment which granted such a right to a utility company under certain conditions. The caption of the bill was amended so as to include the following clause:

"* * * providing that where such lines are built into an unincorporated town, which thereafter becomes an incorporated town, the corporation owning such lines shall have the right to extend, operate and maintain its lines in said town for a period of ten years after the date of such incorporation; * * *"

Other amendments were also added to the bill during its passage, but they relate to matters which I do not consider relevant to the decision of this case. The bill was approved and became effective on May 20, 1949, one day after the present suit was filed in the district court.

Respondent urges that in arriving at the meaning of House Bill 393, the statute should be construed as a whole, and I agree that this is an accepted rule of construction. When it is applied to this case, however, in my opinion, it leads to the conclusion that the whole purpose of the statute is prospective—that it is intended to grant rights not theretofore existing, from and after the effective date of the Act. The first sentence of Section 1 provides that the corporations affected "shall have" certain rights. The second sentence provides that the transmission lines "shall be constructed" according to certain standards. The third sentence provides that such corporations "shall notify" the public officials of their intention to construct lines. The fourth sentence provides that the public agency having jurisdiction "may require" such a corporation to relocate its lines. All of these provisions are obviously intended to be prospective in operation. Then follows the sentence which the parties substantially agree is determinative, which reads in part as follows:

"In the event a State highway or county road on which lines have been built passes through or into an unincorporated city or town, which thereafter becomes an incorporated city or town, the corporation owning such lines shall continue to have the right to build, maintain and operate its lines along, across, upon and over the roads and streets within the corporate limits of

such city or town for a period of ten (10) years from and after the date of such incorporation, but thereafter only with the consent of the governing body of such city or town, * * *."

In my opinion, this language, like the preceding portions of Section 1 of the Act, is intended to be prospective in operation. It grants a right, under certain conditions and for a limited time, to *continue* to exercise rights which for the first time are granted by preceding sentences of Section 1 of this Act. The first sentence of this section grants to corporations affected the right to build and maintain their lines on and along roads and streets in unincorporated areas, which right did not theretofore exist under the Jasper and Hempstead cases. The sentence quoted above is intended to apply to the situation which may arise, after the passage of the Act, where an unincorporated area becomes incorporated. In such event, the Legislature intended, as it says in so many words, that the corporation *"shall continue* to have the right" to build, maintain and operate its lines in the newly incorporated area for ten years from and after the date of the incorporation. The language used in the quoted sentence is appropriate only to the situation where an incorporation of a city occurs after a utility company has rightfully built or maintained its lines in an area; and the right to build or maintain such lines, under our decisions, arose only upon the passage of House Bill 393. Moreover, the words "in the event," "passes," and "becomes," also indicate strongly a situation which, the Legislature expects, may arise in the future. Viewed in this way, the sentence quoted logically fits into the legislative plan of granting certain rights, attaching conditions and obligations to their exercise, and providing for their continuance in the event that conditions should change after the passage of the statute.

As to cities already incorporated at the time of the passage of the statute, the first sentence of Section 1 expressly provides that utility corporations may erect, operate and maintain their lines "with the consent and under the direction of the governing body of such city or town." The Legislature evidently intended to cover a different situation by the sentence we have quoted above, beginning, "in the event . . ." and the natural meaning of the words used is that this provision shall apply where a city or town is incorporated after the passage of the statute.

The caption of the Act expressly requires the consent of the governing body of an incorporated town before the lines of an electric company may be "constructed, erected and maintained"

within the city limits of such town. To hold that the provision as to the right of an electric company to remain for a period of ten years after the date of such incorporation in an unincorporated town which afterwards becomes incorporated, refers to a town incorporated at the time of the passage of the Act, would read into the caption a conflict. In like manner, the body of the Act in Section 1 gives an electric company the right to erect, construct, maintain and operate its lines "over, under, across, upon and along any State highway or county road in the State, *except within the limits of an incorporated city or town* . . ." (Emphasis added.) As to incorporated cities or towns the Act expressly provides that such lines may be erected, maintained and operated only "with the consent and under the direction of the governing body of such city or town." These provisions are plain and unambiguous and cover all cities or towns incorporated at the time of the passage of the Act. Unless the provision under discussion is held to apply only to towns incorporated after the passage of the Act, we will have a conflict in the provisions of Section 1 of the Act. It is the duty of the Courts in construing the acts of the Legislature to construe them so as to avoid a conflict in the provisions of such acts. This can only be done in the case at bar by holding that the "In the event, etc. etc., . . ." provisions apply only to towns incorporated after the effective date of the Act.

The emergency clause (Section 4) of the Act nowhere refers to any emergency arising by virtue of cities and towns then incorporated, but refers to those which were unincorporated at the time lines were built, and shows conclusively that the Legislature did not intend to give electric companies a right to remain in such towns, except by permission of the governing body of such city or town as set out in Section 1 of the Act. Section 4 refers only to "areas outside of the limits of incorporated cities" and "along the edge of the right-of-way and public roads," or to authorize "the maintenance and operation of lines" that have been *so built* under county franchise, etc., and to "standards of construction" of said lines.

Not only is this view in accord with the ordinary and plain meaning of the language of the whole statute, as I understand it, but it is also in agreement with accepted rules of construction that statutes are presumed to be prospective in their operation, and that statutes granting franchises or privileges in derogation of public rights should be strictly construed.

As to the first of these rules of construction, in Piedmont and Arlington Life Insurance Co. v. Ray, 50 Texas 511, 519, this Court said:

"It is a well-settled rule that statutes are always held to operate prospectively, unless a contrary construction is evidently required by their plain and unequivocal language."

Similar language was used in State v. Humble Oil & Refining Co., 141 Texas 40, 43; 169 S.W. 2d 707, 708:

"It is the law of this State, and the law generally, that, in the absence of any special indication or reason, a statute will not be applied retrospectively, even when there is no constitutional impediment against it."

See also 59 C. J., "Statutes", sec. 692; 50 Am. Jur. "Statutes" sec. 478.

As to the second rule of construction applicable here, this Court said with reference to a similar statute in Incorporated Town of Hempstead v. Gulf States Utilities Co., 146 Texas 250, 256; 206 S.W. 2d 227, 230:

"The generally accepted principle that the words of a grant from the public must be taken most strongly against the grantee is also of assistance in appraising the rights the company has obtained under the legislation hereunder consideration. (Whether the rights asserted by the company be denominated a grant, a franchise, or a privilege is not presently of any importance. The principle involved applied equally to all grants from the public in favor of persons or private concerns.) Tersely this principle is stated as follows: 'The general rule is that a grant of a franchise is to be construed in favor of the public, and, if the language used is ambiguous, the grant is to be construed in favor of the grantor and against the grantee.' 37 C. J. S., Franchises, s. 21b. 'The general rule is that nothing passes by implication by the grant of a franchise, except what may be necessary to give effect to the obvious intent of the grant.' 37 C. J. S., Franchises, s. 21c. Another well-put statement of it is in 23 Am. Jur., Franchises, s. 16:

" 'While it is the accepted doctrine that all grants are to be construed according to the intention of the parties, yet there are certain general rules of construction by the light of which such contracts are to be examined. These rules are well settled by numerous authorities. One is that in all grants by the government to individuals or corporations, of rights, privileges,

and franchises, the words are to be taken most strongly against the grantee, contrary to the rule applicable to the grant from one individual to another. One who claims a franchise or privilege in derogation of the common rights of the public must prove his title thereto by a grant clearly and definitely expressed, and cannot enlarge it by equivocal or doubtful provisions or probable inference.' "

The respondent also relies upon the legislative history of the statute to sustain its contentions. Since, in my opinion, the language of the statute plainly should be construed in the way I have indicated, there is no necessity of referring to the legislative history. However, in my opinion, a consideration of the legislative history of this statute would not lead to a different conclusion as to the intention of the Legislature. The majority opinion attaches much importance to Governor Jester's message to the Legislature, dated March 9, 1949, in which he recommends passage of House Bill 393.

Throughout Governor Jester's message, he referred to "electric lines built along the right-of-way of State highways and county roads," and the enjoyment of the benefits of electrical services by the people in the rural areas and *unincorporated towns*. Not a single time did Governor Jester refer to the streets of an incorporated city or town, nor did he speak of the enjoyment of the benefit of electrical services by the inhabitants of an incorporated city or town. That Governor Jester had no idea that the Act would be sought to be applied to a city or town which was incorporated prior to the effective date of the Act is further shown from the fact that the bill as originally introduced, and at the time Governor Jester wrote his letter, contained the following legislative interpretation of the Act:

"Nothing herein shall be construed as granting the right to such corporation to maintain existing lines in any area, which is included within the corporate limits of a city or town prior to the effective date of this Act, without the consent of the governing body of such city or town."

The James Amendment was not made until March 28, 1949.

In adopting this legislative interpretation of House Bill 393, Governor Jester said:

"It is my understanding that Senate Bill No. 203 and House Bill No. 393 will effectuate the desired purpose in this connection, and I hereby submit these bills as emergency matters under

the authority of Sec. 5, Article III, of the Constitution of Texas."

House Bill 393, as originally introduced, contained the above quoted legislative interpretation. This clause, by its terms, shows the legislative intent as to the meaning of the Act; that is, that the Act was not to be construed as operating retroactively, but that a corporation, such as this company, could not maintain its lines in a city or town which was incorporated prior to the effective date of the Act without the consent of the town's governing body. It was with this legislative interpretation that Governor Jester recommended House Bill 393 to the Legislature. It was with this construction that Governor Jester felt that the bill would effectuate the desired purpose.

House Bill 393 was passed by the House with the James Amendment attached, but when it reached the Senate this amendment was stricken. Because of the conflict between the two houses, a Free Conference Committee was requested by the House to consider the bill. In compromise, this committee eliminated both the clause reflecting the legislative intent and the James Amendment. The bill was then passed by both houses and signed by the Governor.

By striking the clause which directed how the Act should be construed, nothing was taken away from the Act for no right that did not already exist was granted by such clause. However, it is clear that the James Amendment did give an affirmative right to corporations, situated as is this company. This right was to continue to maintain and operate its distribution system and necessary facilities incidental thereto within a city or town which was incorporated prior to the effective date of the Act until the expiration date contained in the franchise agreement between the corporation and the Commissioners' Court or ten (10) years whichever is less. By striking this amendment, the Legislature revoked an affirmative right which was given by the amendment. The fact that the original clause specifically exempting cities and towns which were already incorporated from the effect of the bill and the James Amendment which nullified such clause were stricken upon final passage does not indicate a legislative intent that the Act should be construed retroactively for the original paragraph was only a legislative intrepretation of the text of the Act and did not give any rights which did not already exist. By its deletion, nothing was taken from the Act, but it does reflect a legislative construction of the Act. On the other hand, by striking the James Amendment an

affirmative right granted to the utility, situated as is this company, was revoked.

It is also contended that the statute is remedial or curative in effect, and therefore should receive a liberal construction. See 39 Tex. Jur., "Statutes," sec. 145. While this rule may properly be applied in appropriate cases, I do not think it should be used to change the ordinary meaning of statutory language, or to give retrospective effect to a statute granting a franchise in derogation of public rights.

Prior to the passage of House Bill 393, this company had no right, power or authority to use the streets and roads of the City for the erection and maintenance of its poles and lines. This was conclusively held in the Jasper and Hempstead cases and was the undoubted law of this State at the time the City passed its ordinance on March 8, 1949. Since there was no right, the majority opinion gives a right, which is effective as of the date of the incorporation of the City without reference to the effective date of the Act. There was no defect in the law which required remedying. The language used in Slate v. The City of Fort Worth, (Civ. App., no writ history), 193 S.W. 1143, 1144, is especially applicable in this case.

"In this connection (contention that statute is remedial) our views are most aptly expressed in Hamilton County v. Rosche, 50 Ohio St. 103, 33 N. E. 408, 19 LRA 584, 40 Am. St. Rep. 653, where this language is used: 'This statute, it is contended, is remedial and remedial statutes may be retroactive. It is remedial, no doubt, in that enlarged sense of that term where it is employed to designate law which supply defects in, or pare away hardships of, the common law, but not remedial in the sense of providing a more appropriate remedy than the law before afforded to enforce an existing right or obligation. The statute under consideration provided no new method of procedure; it simply imposed upon Hamilton an obligation toward these plaintiffs in error that did not attach to the transaction when it occurred. In attempting to accomplish this result, the Legislature transcended its constitutional powers.' "

The only possible conclusion that may be reached is that here the company is acquiring a new right that did not exist prior to that time under Article 1436, Revised Civil Statutes of Texas, 1925.

As stated in 39 Tex. Jur., Sec. 19, p. 41:

"A validating or curative statute is one enacted for the purpose of curing defects in past proceedings or confirming rights arising out of past transactions."

The defects described are those where there was neglect in complying with some requirements of law or failure to comply with some "technical legal requirement." 10 Words & Phrases, p. 665. The past transaction sought to be cured here is not a technical legal requirement, as contended by the respondent, but is the creation of a new cause of action or defense that had not existed prior to that time. A remedial statute is one which affords a remedy for the enforcement of the obligation or contract. De Cordova v. City of Galveston, 4 Texas 470 and Slate v. City of Fort Worth, 193 S.W. 1143.

Broad powers to build, operate, and maintain utility lines on and along public highways are given to utility corporations under the construction I would adopt; and the statute therefore is not rendered nugatory, but on the contrary, is given full effect. The result of this construction would be merely to deny retrospective operation to the statute as against cities incorporated prior to the passage of the statute, and I believe that in so doing we would be following the plainly expressed legislative intent.

I would reverse the judgment of the Court of Civil Appeals and affirm the judgment of the trial court.

Opinion delivered Feb. 7, 1951.

Rehearing overruled April 4, 1951.