617 F.2d 122
 29 UCC Rep.Serv. 859
 Kim THOMAS, Plaintiff-Appellant,
v.
RELIANCE INSURANCE CO., Defendant-Appellee.
Lloyd I. SCHWARZ et al., Plaintiffs,
Lloyd I. SCHWARZ, Plaintiff-Appellant,
v.
RELIANCE INSURANCE CO., Defendant-Appellee.
RELIANCE INSURANCE COMPANY, Plaintiff-Appellee,
v.
Harvey McDONALD and Franklin Elles, Defendants-Appellants.
RELIANCE INSURANCE CO., Plaintiff-Appellee,
v.
Morris D. JAFFE, Defendant-Appellant.
 Nos. 78-1372, 78-1572, 78-1721 and 78-1895.
 United States Court of Appeals,
Fifth Circuit.
 May 15, 1980.
Rehearings Denied June 17, 1980.
 
 Robert D. McCutcheon, Perryton, Tex., for Kim Thomas.
 Key, Cirr, Evans & Fouts, Donald M. Hunt, Lubbock, Tex., for Reliance Ins. Co.
 Diana Dowd Ulrich, Houston, Tex., James S. Hale, James Denison, Harlingen, Tex., for Lloyd I. Schwarz.
 Diana Dowd Ulrich, Houston, Tex., James S. Hale, Harlingen, Tex., D. F. Martinak, Victoria, Tex., James Denison, Harlingen, Tex., for Harvey McDonald and Franklin Elles.
 Reese L. Harrison Jr., Denise Davis Schwartzman, San Antonio, Tex., for Morris D. Jaffe.
 Appeals from the United States District Court for the Northern District of Texas.
 Before WISDOM, GOLDBERG and HENDERSON, Circuit Judges.
 HENDERSON, Circuit Judge:
 
 
 1
 Reliance Insurance Company (hereinafter referred to as "Reliance") was the surety on a statutory bond in the sum of $500,000.00, on which American Grain and Cattle, Inc. (hereinafter referred to as "American") was principal. The bond was procured by American in compliance with Texas licensing requirements for public grain warehouse facilities. Texas Grain Warehouse Act, Tex.Rev.Civ.Stat.Ann. art. 5577b (Vernon) (Supp.1977) (current version at Tex.Rev.Civ.Stat.Ann. art. 5577b (Supp.1980).
 
 
 2
 An involuntary petition in bankruptcy was filed against American on January 16, 1975. A plan of arrangement under Chapter XI of the Bankruptcy Act was confirmed and American was subsequently discharged in bankruptcy.
 
 
 3
 Because of the many claims filed on the statutory bond, Reliance instituted an interpleader action in the United States District Court for the Northern District of Texas, and deposited the amount of the $500,000.00 bond with the clerk of court. Reliance named 28 claimants under the bond as third-party defendants as well as Morris D. Jaffe, as an indemnitor thereon. Since the total of all of the claims was less than the amount of the bond, there was no controversy among the claimants to the fund. However, because Reliance denied coverage, a controversy arose between Reliance and the claimants.
 
 
 4
 After non-jury trial in the cases now on appeal the district court entered findings of fact and conclusions of law. Kim Thomas, Lloyd A. Schwarz, Harvey McDonald and Franklin Elles (hereinafter sometimes collectively referred to as the "claimants") appeal from judgments entered against them in the district court. Morris D. Jaffe also appeals from the district court's finding of liability against him as an indemnitor on the bond. Because similar facts and legal issues are involved in each case, they were consolidated for oral argument. For the same reason, a single opinion should suffice to dispose of the issues in all the cases.
 
 
 5
 The bond was executed on May 30, 1974. Attached to American's application was an "additional indemnity" provision which stated, inter alia, "(i)n consideration for the execution by Reliance Insurance Company of such bond or bonds, including every continuation, renewal or modification thereof, the undersigned jointly and severally with the applicant, join in and are bound by the foregoing application and indemnity agreement in all respects as if the undersigned had executed the same as applicant." This provision was signed by Morris D. Jaffe in his individual capacity.
 
 
 6
 A trust, created and controlled by Jaffe for his benefit as well as his ex-wife, Jeanette Longoria, and children, owned 5,600,000 shares of preferred stock in American. Along with the bond application, on May 22, 1974, Jaffe tendered a financial statement for the trust. He had no personal financial statement because everything he owned had been placed in the trust. At some unidentified time, Tom Moore, the insurance agent who submitted the bond application to Reliance, called Jaffe and asked if Ms. Longoria would sign as an additional indemnitor, since she was co-beneficiary of the trust. Upon inquiry Ms. Longoria refused and Jaffe relayed this information to Moore. Apparently, there was no more communication concerning the bond, and it was issued on May 30, 1974.
 
 
 7
 In the fall of 1974, Kim Thomas, a farmer, deposited grain with American. He received "scale weight tickets"[1] evidencing the amount deposited but did not request or receive warehouse receipts. He entered into two contracts for the sale of his grain to American, and received two drafts in payment therefor. Both drafts were dishonored.
 
 
 8
 In June and July of 1974, Lloyd I. Schwarz deposited 881,831 pounds of grain with American. Harold Jones, an American field representative, was authorized by Schwarz to sell the grain. Unknown to Schwarz, over half of this total, 503,899 pounds, had been transferred out of his individual account on June 23, 1974, deposited into a "member pool account," and written off by American to cover a shortage in the 1973 member pool account. In September and November of 1974, American issued sales confirmations to Schwarz showing that Jones had negotiated sales of Schwarz' grain, the sales purportedly totaling the 881,831 pounds originally deposited. However, only 377,932 pounds of the grain remained because of the unauthorized transfer. Thus, the confirmations reflected sales of non-existent grain. Schwarz never received payment for any of this grain.
 
 
 9
 In 1973, Harvey McDonald and Franklin Elles joined American's "member pool system" whereby American would sell their grain and make payments on a quarterly basis. Neither received his 1973 fourth-quarter distribution. McDonald and Elles did not join the pool in 1974, but in June and July they did deposit additional grain with American. In August, 1974, a portion of this grain was sold to American through its representative, Harold Jones. American failed to pay for this grain.
 
 
 10
 None of the claimants ever requested or received warehouse receipts for their grain, and none attempted to recover the grain after non-payment. All of the sales called for deferred payment.
 
 
 11
 After a non-jury trial, the district judge severed the cases and issued separate memorandum opinions in each. He found that in those sales from the claimants to American, the sellers lost their status as "depositors" and simply became "creditors" of American. Therefore, he concluded, they lost the protection afforded depositors of grain under art. 5577b, supra, and the bond provided no coverage. The court held that McDonald's and Elles' claim for 1973 fourth-quarter member pool distribution was not covered by the bond because it did not become effective until May of 1974. The 1974 transfer of Schwarz' grain into the member pool was protected by the bond, and Schwarz was allowed to recover the fair market value of the transferred grain. The court also ruled that, to the extent Reliance might be answerable on the bond, the sums received by the claimants in the bankruptcy proceedings must be off-set against Reliance's liability.
 
 
 12
 The district court concluded that Jaffe had agreed to indemnify Reliance for certain of its losses on the bond, and, consequently, was accountable to Reliance in the amount of $212,458.78.
 
 
 13
 The claimants' losses are not embraced by the bond, unless American was pursuing its function as a public grain warehouse in purchasing the grain and failing to pay therefor. Moreover, the claimants must fall within the category of "depositors of grain" as defined by art. 5577b.[2]
 
 
 14
 Unfortunately, our attempt at statutory construction lacks the assistance of any relevant Texas court interpretation of the Grain Warehouse Act in force when this action arose. Thus, we must make an "educated guess" as to how the Texas Supreme Court would decide the issues presented in these cases. Benante v. Allstate Ins. Co., 477 F.2d 553, 554 (5th Cir. 1973); Smoot v. State Farm Mut. Auto. Ins. Co., 299 F.2d 525, 529 (5th Cir. 1962). While we cannot be sure of the result the Texas courts would reach, we are guided by the rules the courts of that state must follow in attempting to interpret this statute:
 
 
 15
 In construing a statute, we are guided by the general rules of statutory construction and by cases interpreting such statute. The general rules of construction are: (1) the court must be governed by the rule of common sense. National Surety Corp. v. Ladd, 131 Tex. 295, 115 S.W.2d 600 (1938); (2) the intention of the Legislature in enacting a statute is the statute itself and the aim and object of construction is to ascertain and enforce legislative intent and not to defeat, nullify or thwart it. City of Mason v. West Texas Utilities Co., 150 Tex. 18, 237 S.W.2d 273 (1951); (3) the court must construe a statute as written and, if possible, ascertain its intention from the language used therein and not look for extraneous matters to be used as a basis for reading into a statute an intention not expressed or intended to be expressed therein. Government Personnel Mutual Life Insurance Co. v. Wear, 151 Tex. 454, 251 S.W.2d 525 (1952); (4) if a statute is subject to two interpretations, it should not be given one that would render enforcement impossible. Davis v. Estes, 44 S.W.2d 952 (Tex.Com.App.1932, holding approved); (5) the general rules for the construction of all written instruments apply to the construction of legislative acts. Malloy v. Galveston County, 42 S.W.2d 163 (Tex.Civ.App. Galveston 1931, writ ref'd).
 
 
 16
 Baylor Univ. Med. Center v. Borders, 581 S.W.2d 731, 733 (Tex.Civ.App.1979).
 
 
 17
 We find some enlightenment in the judicial interpretations of other laws relating to performance bonds, some predecessors of the statute in question here. It is well-settled in Texas that where a bond covers the faithful performance of duties prescribed by statute, the surety is not liable for injuries resulting from actions other than those required by the statute, or naturally and reasonably incident to their performance. Brown v. Sneed, 77 Tex. 471, 14 S.W. 248 (1890); Republic Underwriters v. Tillamook Bay Fish Co., 133 Tex. 141, 126 S.W.2d 641 (1937); Farmers Elevator Mutual Ins. Co. v. J. R. Milam Co., 435 F.2d 140 (5th Cir. 1970) (Texas law applied); Aetna Ins. Co. v. Junction Warehouse Co., 389 F.2d 464 (5th Cir. 1968) (Texas law applied); see also, Indemnity Ins. Co. of North America v. Archibald, 299 S.W. 340 (Tex.Civ.App.1927). We look then to the statute to determine the duties placed upon public warehouses by the Texas legislature.
 
 Art. 5577b provides
 
 18
 Sec. 7. (a) Each applicant for a license to conduct a warehouse under this Act shall, as a condition to the granting thereof, file or have on file with the commissioner, a bond . . . .
 
 
 19
 (b) Such bond shall: . . . (2) be conditioned upon the faithful performance of all obligations of a licensed warehouseman as to receipted grain and open storage grain under the terms of this Act and regulations hereunder from the effective date of the bond until the license is revoked or the bond is cancelled as provided in this Act, whichever occurs first; and (3) be further conditioned upon the faithful performance from the effective date of the bond and thereafter, whether or not said warehouse remains licensed under this Act, of such obligations as a warehouseman under contract with depositors of grain in the warehouse as exists on the effective date of the bond or are thereafter assumed prior to the time the license of the warehouseman is revoked or the bond is cancelled as provided herein, whichever occurs first . . . .
 
 
 20
 In discerning the "obligations" of a licensed warehouseman, we first turn to the definition of "warehouseman." He is "any person engaged in the business of operating a public grain warehouse . . . ." Art. 5577b, § 2(e). A "public grain warehouse" is "(any) building, bin, or similar structure used for receiving, storage, shipment or handling of grain for hire, or for purchase and sale of grain, or of grain on which payment is deferred." Art. 5577b, § 2(d). Only a "depositor" of grain has a right of action on the bond. Art. 5577b, § 8(a). A " '(d)epositor' means any person who deposits grain in a warehouse for storage, handling, or shipment, or who is the owner or legal holder of any outstanding receipt, or who is lawfully entitled to possession of the grain." Art. 5577b, § 2(f).
 
 
 21
 There is no doubt that when each of the claimants first deposited his grain American was acting as a public grain warehouse. The question is whether that status continued after the sale of the claimants' grain to American.
 
 
 22
 Appellants Thomas, Schwarz, McDonald and Elles summarize their argument as follows: Art. 5577b provides that a bond must issue guaranteeing the faithful performance of all duties as a public warehouseman. These responsibilities include the handling of sales and purchases of grain and the handling of grain on which payment is deferred. If the warehouse does not faithfully perform these duties, there is liability. Here, they contend, the bond covers their losses because the warehouse defaulted on its obligation to pay for grain, which is a defalcation both in handling grain on which payment is deferred and in the purchase and sale of grain. In other words, they maintain that the bond insured the solvency of American.
 
 
 23
 The Texas legislature did not intend such a meaning in enacting art. 5577b. Admittedly, the legislative intent is not easily discovered from a reading of the statute, but we must begin with the language of the statute itself. Baylor Univ. Med. Center. Again, the definition of "public grain warehouse" is of paramount importance. The statute defines that term only by reference to the function of a "building, bin, or similar structure." A structure is a warehouse if it is used for "receiving, storage, shipment and handling of grain." We think that the "of" placed before "grain upon which payment is deferred" clearly refers back to these functions. Thus, a building is a public grain warehouse when it is used for "receiving, storage, shipment and handling . . . of grain on which payment is deferred." The words, "on which payment is deferred" merely define the type of grain involved. It follows that losses from a transaction between a warehouse and another involving grain on which payment is deferred are covered only if the losses resulted from the warehouse's receiving, storage, shipping or handling of the grain. Default on payment for the grain simply does not fit into any of those categories.
 
 
 24
 The language "for purchase and sale of grain" presents a more difficult problem. It is sandwiched between two phrases describing the type of grain covered ("grain for hire" and "grain on which payment is deferred"). There are two possible constructions. This might simply describe the type of grain being received, stored, shipped or handled, in which case the legislature meant that a public grain warehouse is "any building . . . used for receiving, storage, shipment or handling . . . of grain for purchase and sale." On the other hand, the legislature may have intended to identify a totally different role, the "purchase and sale of grain," for a public grain warehouse. If so, it would follow that it meant for the bond to encompass a warehouse's default in payment for grain purchased from a depositor.
 
 
 25
 We think the former construction is the more reasonable. First, it is compatible with the purpose of the language contained in the remainder of the sentence defining the duties of the grain warehouse. Second, we cannot perceive that the legislature would restrict the statute's coverage to grain stored for a fee or which had been sold but not paid for. Third, if the Texas legislature intended to create a solvency bond, we believe it would have stated so in such terms. Finally, although this is not entirely clear, the legislature may have been attempting to exclude the latter meaning by defining "storage grain" as "any grain received in any public warehouse, . . . and same is not purchased by the lessee, owner or manager of such warehouse . . . ." Art. 5577b, § 2(j). Thus, we hold that this phrase, like the phrase "of grain upon which payment is deferred," is merely descriptive of the type of grain involved. And, because losses are recoverable only when the warehouse is receiving, storing, shipping or handling this type of grain, a default in the payment of the grain is not covered by the bond.[3]
 
 
 26
 Nor can we accept these appellants' contention that they were depositors within the meaning of art. 5577b. Clearly, once they sold their grain American was no longer storing, handling or shipping it for them. It no longer belonged to them. And, it is undisputed that none of the claimants received any warehouse receipts for the grain. They insist though that they were "lawfully entitled to possession of the grain," art. 5577b, § 2(f), because, upon default, they had ten days to repossess it from the breaching buyer under Tex.Bus. & Com.Code Ann. § 2.702(b) (Vernon). Section 2.702(b) extends the right of reclamation only to credit sellers who have sold goods to buyers who received them while insolvent. In any event, a right of reclamation not exercised within the ten days is lost. Sorrels v. Texas Bank and Trust Co., 597 F.2d 997, 1000-01 (5th Cir. 1979); Matter of Samuels and Co., 526 F.2d 1238, 1244-45 (5th Cir.) (en banc), cert. denied, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976). None of the claimants attempted to reclaim within the ten-day period.
 
 
 27
 Alternatively, Thomas also urges that he falls within the coverage of section 7(b)(3) of art. 5577b, which states that the public grain warehouseman's bond shall
 
 
 28
 be further conditioned upon the faithful performance from the effective date of the bond and thereafter, whether or not said warehouse remains licensed under this Act, of such obligations as a warehouseman under contract with depositors of grain in the warehouse as exists on the effective date of the bond or are thereafter assumed prior to the time the license of the warehouseman is revoked or the bond is cancelled as provided herein, whichever occurs first . . . .
 
 
 29
 (Emphasis supplied.) This language, he contends, extends the bond's reach to duties assumed by contract. See, Farmers Elevator Mutual Ins. Co. v. J. R. Milam Co., 435 F.2d 140 (5th Cir. 1970). However, because we have decided that Thomas is not a depositor within the meaning of art. 5577b, whatever protection is afforded by section 7(b)(3) does not include him.[4]
 
 
 30
 The only remaining issue is that of indemnity. Morris D. Jaffe argues that the insurance agent's request for his ex-wife's signature on the indemnity agreement was a counter offer which was rejected. Clearly, under Texas law, the agent's request of Jaffe was no counter offer. The agent's "words and acts bring his case under the law relating to inquiries rather than that of a counter offer. His language was that of inquiry rather than promise." KVET Broadcasting Co. v. Tiemann, 447 S.W.2d 457, 460 (Tex.Civ.App.1969).
 
 
 31
 Jaffe also claims that there was no contract since he was never notified of acceptance of his offer. However, according to Texas law, where an offer is made to one to perform an act, a contract results without notice of acceptance if the act is performed. United Concrete Pipe Corp. v. Spin-Line Co., 430 S.W.2d 360, 364 (Tex.1968). Here, the language of the indemnity provision makes clear that Jaffe's signing that document constituted an offer to Reliance to issue the bond. Thus, by executing the bond, Reliance completed the contract, and no further notice was required.
 
 
 32
 Finally, Jaffe appears to contend that he is not liable as an indemnitor because he was not a principal on, and did not sign, the bond. He is correct that he is not a principal on the bond. He is not liable as a principal, but rather as one who agreed to indemnify the surety, Reliance, against certain liabilities it might incur on the bond. Thus, the fact that Jaffe is not a principal and did not sign the bond as such is irrelevant.
 
 The judgment of the district court is
 
 33
 AFFIRMED.
 
 
 
 [1]
 " 'Scale weight ticket' . . . means a load slip other than a receipt, given depositor by a warehouseman licensed under this Act, upon initial delivery of the grain to the warehouse. Such ticket shall be nonnegotiable." Tex.Rev.Civ.Stat.Ann. art. 5577b, § 2(h) (Vernon)
 
 
 [2]
 McDonald, Elles and Schwarz contend that there was no sale to American of their grain, either as a matter of law or as a matter of fact. We reject this argument. See, n.4, infra
 
 
 [3]
 McDonald and Elles argue that American's failure to pay for the fourth quarter distribution under the 1973 member marketing pool arrangement also is protected by the bond. However, they admit that unless we agree with their position that grain sales to American are included in the bond this point lacks merit. Because of our difference of opinion with the premise that such sales are covered, we agree that their argument is without substance
 
 
 [4]
 McDonald, Elles and Schwarz all assert that, either as a matter of law or a matter of fact, there was no sale of grain to American, and thus they remained depositors of grain. We will assume, for the purposes of argument, that the failure of a sale in law or fact would allow them to maintain their status as depositors. McDonald and Elles first claim that a sale by them to American was never established at trial. We conclude that the district court's finding that a sale did occur is not clearly erroneous. Rule 52(a), Fed.R.Civ.P. Second, Schwarz says that the trial court's reliance on Tex.Bus. & Com.Code Ann. § 2.401 (Vernon) in ruling that he sold his grain to American was misplaced. However, the only district court reference to section 2.401 took place during an exchange between the court and counsel for a party in another of the cases involving claims on the bond. See Trial Transcript, at 113. There is no reliance by the district court on section 2.401 in the Schwarz case. Finally, McDonald, Elles and Schwarz contend that there was no sale as a matter of law because none of them had any intent to sell to American. However, it is uncontradicted that each gave Harold Jones authority to sell their grain and did not restrict him as to the purchaser or purchasers. Thus, we fail to see how their alleged lack of intent is relevant absent a showing that they communicated a desire to Jones that he refrain from selling to American